1 | DAVID J. HACKER
California Bar No. 249272
2 | Illinois Bar No. 6283022
3 | ALLIANCE DEFENDING FREEDOM
101 Parkshore Drive, Suite 100
4 | Folsom, California 95630
Phone: (916) 932–2850
5 | dhacker@ADFlegal.org

6

7 | Attorneys for Plaintiffs

8 | **UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF CALIFORNIA**
9

10 | **NATIONAL INSTITUTE OF FAMILY AND LIFE ADVOCATES d/b/a NIFLA**, | Case No. 3:15-cv-02277-JAH-DHB
11 | a Virginia corporation; **PREGNANCY CARE CENTER d/b/a PREGNANCY**
12 | **CARE CLINIC**, a California corporation; and **FALLBROOK PREGNANCY**
13 | **RESOURCE CENTER**, a California corporation;
14

15 | **Plaintiffs,**

16 | **v.** | **MEMORANDUM OF POINTS AND AUTHORITIES IN**

17 | **KAMALA HARRIS**, in her official capacity as Attorney General for the State | **SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**
18 | of California; **THOMAS MONTGOMERY**, in his official capacity
19 | as County Counsel for San Diego County; | Accompanying papers: Plaintiffs'
**MORGAN FOLEY**, in his official capacity | Notice of Motion and Motion for
20 | as City Attorney for the City of El Cajon, | Preliminary Injunction
CA; and **EDMUND G. BROWN, JR.**, in
21 | his official capacity as Governor of the
State of California;
22

23 | **Defendants.**

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................ iii

INTRODUCTION ............................................................................................... 1

FACTUAL BACKGROUND................................................................................ 2

ARGUMENT....................................................................................................... 6

I.     PLAINTIFFS HAVE DEMONSTRATED A LIKELIHOOD OF
SUCCESS ON THE MERITS ON THEIR FIRST AMENDMENT
FREE SPEECH CLAIM. ............................................................................ 7

     A.    The Act impermissibly requires Plaintiffs to engage in
compelled speech. ......................................................................... 8

     B.    The Act Is Subject to Strict Scrutiny as Content - and
Viewpoint-Based Regulation. .................................................... 10

     C.    The Act fails strict scrutiny. ...................................................... 15

          1.    *Most pregnancy center disclosure laws have been
enjoined.*............................................................................. 15

          2.    *The Act does not serve a compelling interest.* .......... 16

          3.    *The Act is not narrowly tailored to California's alleged
interests.*........................................................................... 20

II.    PLAINTIFFS HAVE DEMONSTRATED A LIKELIHOOD OF
SUCCESS ON THE MERITS OF THEIR FREE EXERCISE
CLAIM. .................................................................................................. 23

III.   PLAINTIFFS MEET THE REMAINING PRELIMINARY
INJUNCTION FACTORS. ...................................................................... 24

CONCLUSION................................................................................................. 25

# TABLE OF AUTHORITIES

***Cases*:**

*ACLU v. Ashcroft,*
   322 F.3d 240 (3d Cir. 2003) .......................................................... 25

*Alliance for the Wild Rockies v. Cottrell,*
   632 F.3d 1127 (9th Cir. 2011) ........................................................ 7

*Angelotti Chiropractic, Inc. v. Baker,*
   791 F.3d 1075 (9th Cir. 2015) .................................................... 7, 15

*Austin Lifecare, Inc. v. City of Austin,*
   No. 1:11-cv-00875-LY (W.D. Tex. June 23, 2014) ....................... 15

*Board of Trustees of the State University of New York v. Fox,*
   492 U.S. 469 (1989) ....................................................................... 14

*California Democratic Party v. Jones,*
   530 U.S. 567 (2000) ....................................................................... 17

*Central Hudson Gas & Electric Corp. v. Public Service Commission,*
   447 U.S. 557 (1980) ....................................................................... 14

*Centro Tepeyac v. Montgomery County,*
   722 F.3d 184 (4th Cir. 2013) ......................................................... 16

*Centro Tepeyac v. Montgomery County,*
   5 F. Supp. 3d. 745 (D. Md. 2014) ......................................... 2, 15,16

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,*
   508 U.S. 520 (1993) ....................................................... 16, 17, 20, 23

*City of Boerne v. Flores,*
   521 U.S. 507 (1997) ....................................................................... 16

*Consolidated Edison Co. of New York v*
*Public Service Commission of New York,*
   447 U.S. 530 (1980) ....................................................................... 17

*Elrod v. Burns,*
   427 U.S. 347 (1976) ....................................................................... 25

*Employment Division v. Smith,*
    *494 U.S. 872 (1990)* ................................................................................24

*Evergreen Ass'n, Inc. v. City of New York,*
    801 F. Supp. 2d 197 (S.D.N.Y. July 13, 2011) ................................... 6

*Frisby v. Schultz,*
    487 U.S. 474 (1988) ................................................................ 16, 21, 22

*Greater Baltimore Center for Pregnancy Concerns, Inc. v.*
    *Mayor & City Council of Baltimore,*
    721 F.3d 264 (4th Cir. 2013) ...................................................................16

*Hurley v. Irish-American. Gay, Lesbian, & Bisexual Group of Boston,*
    515 U.S. 557 (1995) ...................................................................................8

*Miller v. Reed,*
    176 F.3d 1202 (9th Cir 1999) .................................................................24

*New York State Club Ass'n v. City of New York,*
    487 U.S. 1 (1988) ...................................................................................... 7

*O'Brien v. Mayor & City Council of Baltimore,*
    768 F. Supp. 2d 804 (D. Md. 2011) ......................................................*15*

*Pacific Gas & Electric Co. v. Public Utility Commission of California,*
    475 U.S. 1 (1986) ................................................................................ 8, 25

*Perry Education Ass'n v. Perry Local Educators' Ass'n,*
    460 U.S. 37 (1983) ...................................................................................12

*Pickup v. Brown,*
    740 F.3d 1208 (9th Cir. 2013) ........................................................ 14, 20

*Planned Parenthood v. Casey,*
    505 U.S. 833 (1992) .................................................................................14

*Playboy Entertainment Group., Inc.,*
    529 U.S. 813 (2000) ...................................................................16, 17, 21, 23

*Police Department of City of Chicago v. Mosley,*
    408 U.S. 92 (1972) ...................................................................................10

*R.A.V. v. City of Saint Paul*,
 505 U.S. 377 (1992) ........................................................................ 10, 12

*Reed v. Town of Gilbert*,
 135 S. Ct. 2218 (2015) ........................................................................... 11

*Riley v. National Federation of the Blind of North Carolina Inc.*,
 487 U.S. 781 (1988) ...................................................... 8, 10, 11, 21, 22

*Rosenberger v. Rectors and Visitors of University of Virginia*,
 515 U.S. 819 (1995) ............................................................................... 12

*Simon & Schuster, Inc. v. Members of New York State
 Crime Victims Board,*
 502 U.S. 105 (1991) ............................................................................... *10*

*Sorrell v. IMS Health*,
 131 S. Ct. 2653 (2011) ........................................................................... 10

*The Evergreen Ass'n v. City of New York*,
 740 F.3d 233 (2d Cir. 2014) ....................................... 2, 11, 13, 15

*Thomas v. Anchorage Equal Rights Commission*,
 165 F.3d 692 (9th Cir. 1999) ................................................................. 24

*Thomas v. Collins*,
 323 U.S. 516 (1945) ............................................................................... 17

*Thompson, Secretary of Health and Human Services v. Western States
 Medical Center*
 535 U.S. 357 (2002) ............................................................................... 23

*Turner Broadcasting System, Inc. v. F.C.C.*,
 512 U.S. 622 (1994) ......................................................................... 12, 18

*Turner Broad. System Inc. v. FCC* ("Turner I"),
 512 U.S. 624 (1994) ............................................................................ 9, 17

*Turner Broad. System Inc. v. FCC* (*"Turner II"*),_
 520 U.S. 180 (1997) ............................................................................... 17

*United States v. Playboy Entertainment Group, Inc.*,
 529 U.S. 803 (2000) ............................................................................... 16

*West Virginia State Board of Education v. Barnette*,
    319 U.S. 624 (1943) ..................................................................... 8

*Wooley v. Maynard*,
    430 U.S. 705 (1977) ..................................................................... 8

***Statutes*:**

Cal. CONST. Art. IV, Sec. 8 ....................................................... 6

**Other Authorities**:

California Assembly Health Committee Bill analysis, available at
    http://www.leginfo.ca.gov/pub/1516/bill/asn/ab_07510800/ab_775_cf
    a_20150425_202527_asm_comm.html (last accessed Oct. 6, 2015) ........... 11

Medi-Cal, "Abortions," *available at* https://files.medi-
    cal.ca.gov/pubsdoco/publications/masters-
    mtp/part2/abort_m00o03.doc (last accessed Oct. 12, 2015) ...................... 13

NARAL Pro-Choice California, Unmasking Fake Clinics, available at
    http://www.prochoiceamerica.org/ca-cpcs/full-report-un.html (last
    accessed Oct. 7, 2015) .............................................................. 19

Pregnancy Resource Centers: Ensuring Access and Accuracy of Information,
    Public Law Research Institute UC Hastings College of the Law,
    available at https://www.heartbeatinternational.org/pdf/CrisisCenter
    Regulation_Final.pdf (last accessed Oct. 6, 2015) .......................... 19

1    Come now the Plaintiffs, by and through their attorneys, and in support of

2   their motion for preliminary injunction offer the following memorandum of law.

3                                    **INTRODUCTION**

4    This case is a federal civil rights action brought to protect the freedom from

5   coerced government speech directly imposed by California Assembly Bill 775,

6   the Reproductive FACT Act (hereinafter the "Act") (attached to the Verified

7   Complaint as Exhibit A), which became law on October 9, 2015. Plaintiff

8   pregnancy centers are non-profit organizations that offer free information and

9   services to women to empower them to make choices other than abortion. The

10  Act forces them to recite government messages promoting abortion and deterring

11  women from speaking with them. The Act's required disclosures significantly

12  undermine the pro-life message of the Plaintiff centers. This directly attacks their

13  core First Amendment right to decide what, when and how to speak.

14   The Act forces Plaintiff centers that have medical licenses, such as Plaintiff

15  Pregnancy Care Clinic (PCC) and other similar members of Plaintiff National

16  Institute of Family and Life Advocates (NIFLA), to post and distribute a

17  disclosure stating that the State of California provides free or low-cost abortion

18  and contraception services, and to provide the phone number for the local county

19  social services office to refer or arrange for such services. The Act further

20  requires that Plaintiff centers that are unlicensed and engage in no medical

21  services, such as Plaintiff Fallbrook Pregnancy Resource Center (Fallbrook) and

22  other similar NIFLA members, post disclaimers within their facilities and in all of

23  their advertising materials, websites, and many communications, imposing a

1

negative and up front message declaring that they do not have a licensed medical provider on staff. The Act imposes this disclosure even though such centers engage in no medical practices.

Both kinds of disclosures have been subjected to strict scrutiny and struck down by courts around the country. *See, e.g., The Evergreen Ass'n v. City of New York*, 740 F.3d 233 (2d Cir. 2014) (striking down the requirement that centers tell women they do not do abortions); *Centro Tepeyac v. Montgomery Co.*, 5 F. Supp. 3d. 745 (D. Md. 2014) (striking down requirement that centers post signs saying they are not medical providers). The Act violates the First Amendment right to free speech because it imposes government-required speech into the heart of an ideological non-profit message. The Act also violates Plaintiffs' rights under the First Amendment right to free exercise of religion.[1] Preliminary injunctive relief is needed prior to the Act's effective date of January 1, 2015, to prevent the irreparable harm that will immediately ensue against Plaintiffs' free speech and exercise rights on that date.

## FACTUAL BACKGROUND

Plaintiffs are two non-profit pro-life pregnancy centers in San Diego County, PCC and Fallbrook, and a national network of similar centers, NIFLA. Verified Complaint (hereinafter "VC") ¶¶ 2, 4–5. Together they seek to provide help and pro-life information to women in unplanned pregnancies so that they

---

[1] Plaintiffs' Complaint alleges other federal and state constitutional and statutory violations. Verified Complaint ¶ 170–79; 193–217. Due to the strength of Plaintiffs' First Amendment claims, this motion focuses on the free speech and free exercise claims only.

will be supported in choosing to give birth, and practical medical or non-medical support free of charge in support of Plaintiffs' pro-life viewpoint. VC ¶ 2.

NIFLA is a non-profit membership organization comprised of a network of both licensed medical as well as unlicensed non-medical centers providing pro-life information and services to women in unplanned pregnancies. *Id.* at ¶ 41. It has 111 members in the state of California that are regulated by the Act. *Id.* at ¶ 18. NIFLA, PCC and Fallbrook are incorporated as religious organizations and pursue their activities pursuant to those religious beliefs. *Id.* at ¶¶ 36, 40, 42. Most of NIFLA's California members are likewise religious. *Id.* at ¶ 48.

PCC provides pregnancy-related licensed medical as well as non-medical information and services without charge, and in furtherance of its religious beliefs. *Id.* at ¶ 21, 32, 36. PCC is licensed by the California Department of Public Health as a free community clinic, and is a licensed clinical laboratory. *Id.* at ¶ 30. Medical services provided by PCC include: urine pregnancy testing, ultrasound examinations, medical referrals, prenatal vitamins, information on STDs, information on natural family planning, health provider consultation, and other clinical services. *Id.* at ¶ 33. Non-medical services provided by PCC include: peer counseling and education, emotional support, maternity clothes, baby supplies, support groups, and healthy family support. *Id.* at ¶ 35.

Fallbrook is a religious not-for-profit corporation that provides non-medical pregnancy-related information and services without charge, and in furtherance of its religious beliefs. *Id.* at ¶ 22, 40. Fallbrook provides free pregnancy test kits that women administer and diagnose themselves, educational programs, resources

and community referrals, maternity clothes, and baby items. *Id*. at ¶ 38. Fallbrook contracts with a separate organization that is a licensed medical provider of ultrasound services; Fallbrook refers women to that provider's separate mobile facility located nearby. *Id*. at ¶ 39.

The Act requires licensed medical pregnancy centers such as PCC and NIFLA's licensed California members to provide a notice to all clients stating that:

> California has public programs that provide immediate free or low-cost access to comprehensive family planning services (including all FDA-approved methods of contraception), prenatal care, and abortion for eligible women. To determine whether you qualify, contact the county social services office at [phone number].

Exh. 1 at 3. A "licensed covered facility" is defined as a:

> [F]acility licensed under Section 1204 or an intermittent clinic operating under a primary care clinic pursuant to subdivision (h) of Section 1206, whose primary purposes is providing family planning or pregnancy-related services, and that satisfies two or more of the following: (1) The facility offers obstetric ultrasounds, obstetric sonograms, or prenatal care to pregnant women. (2) The facility provides, or offers counseling about, contraception or contraceptive methods. (3) The facility offers pregnancy testing or pregnancy diagnosis. (4) The facility advertises or solicits patrons with offers to provide prenatal sonography, pregnancy test, or pregnancy options counseling. (5) The facility offers abortion services. (6) The facility has staff or volunteers who collect health information from clients.

Exh. A at 2–3. This part of the Act contains two exemptions: "(1) A clinic directly conducted, maintained, or operated by the United States or any of its departments, officers, or agencies," and "(2) A licensed primary care clinic that is

4

enrolled as a Medi-Cal provider and a provider in the Family Planning, Access, Care, and Treatment Program." *Id*. at 3. Upon information and belief, the second exemption effectively exempts abortion clinics from the Act's requirements, but does not generally apply to pro-life pregnancy centers such as Plaintiffs.

All licensed covered facilities must post the required disclosure in one of the following ways:

> (A) A public notice posted in a conspicuous place where individuals wait that may be easily read by those seeking services from the facility. The notice shall be at least 8.5 inches by 11 inches and written in no less than 22-point type.
>
> (B) A printed notice distributed to all clients in no less than 14-point type.
>
> (C) A digital notice distributed to all clients that can be read at the time of check-in or arrival, in the same point type as other digital disclosures. A printed notice as described in subparagraph (B) shall be available for all clients who cannot or do not wish to receive the information in a digital format.

Exh. A at 3–4.

The Act requires unlicensed non-medical pregnancy centers, such as Fallbrook and similar NIFLA members, to post a notice to all clients that "the facility is not licensed as a medical facility by the State of California and has no licensed medical provider who provides or directly supervises the provision of services." Exh. A at 4. The Act defines "unlicensed covered facility" as:

> [A] facility that is not licensed by the State of California and does not have a licensed medical provider on staff or under contract who provides or directly supervises the provision of all of the services, whose primary purpose is providing pregnancy-related services, and

that satisfies two or more of the following: (1) The facility offers obstetric ultrasounds, obstetric sonograms, or prenatal care to pregnant women. (2) The facility offers pregnancy testing or diagnosis. (3) The Facility advertises or solicits patrons with offers to provide prenatal sonography, pregnancy tests, or pregnancy options counseling. (4) The facility has staff or volunteers who collect health information from clients.

*Id*. at 3. The required notice for unlicensed facilities must be "disseminate[d] to clients on site and in any print and digital advertising material[] including Internet Web sites." *Id*. at 4.

Covered facilities that violate the law "are liable for a civil penalty of five hundred dollars ($500) for a first offense and one thousand dollars ($1,000) for each subsequent offense," enforceable by the Attorney General, city attorney, or county counsel. *Id*. at 1, 4. The Act became law by Defendant Governor Brown's signature on October 9, 2015. It goes into effect against the Plaintiffs on January 1, 2015. *See* CAL. CONST. Art. IV, Sec. 8.

The Act imposes an imminent and irreparable harm on Plaintiff centers. It subjects them to an intolerable choice: comply with the Act's disclosures in contradiction of their freedom of speech and religion; refuse to comply and be subject to the Act's penalties which would cripple them as small non-profit organizations, or cease their expressive activities altogether. To prevent this irreparable harm Plaintiffs need the Court to issue injunctive before January 1. *See, e.g., Evergreen Ass'n, Inc. v. City of New York*, 801 F. Supp. 2d 197, 211 (S.D.N.Y. July 13, 2011) (granting motion "to preliminarily enjoin Local Law 17 from taking effect on July 14, 2011).

6

**ARGUMENT**

In considering Plaintiffs' request for a preliminary injunction, the Court reviews whether Plaintiffs are "'likely to succeed on the merits, ... likely to suffer irreparable harm in the absence of preliminary relief,' whether 'the balance of equities tips in [their favor],' and whether "an injunction is in the public interest.'" *Angelotti Chiropractic, Inc. v. Baker*, 791 F.3d 1075, 1081 (9th Cir. 2015) (quoting *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011)). "Serious questions going to the merits and hardship balance that tips sharply towards [plaintiffs] can [also] support issuance of a[] [preliminary] injunction, so long as there is a likelihood of irreparable injury and the injunction is in the public interest." *Id.* (quoting *Cottrell*, 632 F.3d at 1132). Plaintiffs satisfy each of these requirements, and are therefore entitled to injunctive relief.

NIFLA asks the Court to grant the injunction with respect to all of its California members, rather than requiring 111 of them to be named as co-plaintiffs. This is appropriate under *New York State Club Ass'n v. City of New York*, 487 U.S. 1, 9 (1988) because NIFLA's members "would otherwise have standing to sue in their own right"; NIFLA's asserted interests in protecting its members' ability to advocate their message consistent with their pro-life and religious beliefs free from compelled government speech "are germane to [NIFLA's] purpose" of supporting its members and, indeed, are at the heart of NIFLA's purpose; and "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit" since NIFLA's members are subject to the Act in ways parallel to PCC and Fallbrook and the relief they

request raises pure questions of law applicable to centers in general.

### I.     PLAINTIFFS HAVE DEMONSTRATED A LIKELIHOOD OF SUCCESS ON THE MERITS ON THEIR FIRST AMENDMENT FREE SPEECH CLAIM.

#### A. The Act impermissibly requires Plaintiffs to engage in compelled speech.

The Supreme Court has explained that the "right to speak and the right to refrain from speaking are complementary components of the broader concept of 'individual freedom of mind.'" *Wooley v. Maynard*, 430 U.S. 705, 714 (1977) (citing *W.V. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 637 (1943)). Accordingly, the Court has emphasized that the First Amendment protects not only the right of a speaker to choose what to say, but also the right of the speaker "to decide what not to say." *Hurley v. Irish-Am. Gay, Lesbian, & Bisexual Grp. of Bos.*, 515 U.S. 557, 573 (1995) (quoting *Pac. Gas & Elec. Co. v. Pub. Util. Comm'n of Cal.*, 475 U.S. 1, 16 (1986)) (internal quotation marks omitted). In this manner, the First Amendment "presume[s] that speakers, not the government, know best both what they want to say and how to say it." *Riley v. Nat'l Fed. of the Blind of N.C., Inc.*, 487 U.S. 781, 791 (1988). Therefore, the government "may not substitute its judgment as to how best to speak for that of speakers and listeners; free and robust debate cannot thrive if directed by the government." *Id.* at 791. The First Amendment protects Plaintiffs from being compelled to engage in government-sanctioned speech.

"In the context of protected speech," any "difference between compelled speech and compelled silence . . . is without constitutional significance." *Id.* at

796. "Laws that compel speakers to utter or distribute speech bearing a particular message are subject to the same rigorous scrutiny" as those "that suppress, disadvantage, or impose differential burdens upon speech because of its content." *Turner Broad. Sys. Inc. v. FCC* ("Turner I"), 512 U.S. 624, 642 (1994).

Here, the Act imposes compelled government messages on certain non-profit pro-life organizations that provide information and free help to pregnant women to empower them to choose not to have abortions. It forces Plaintiffs to post certain disclosures in violation of their First Amendment right to free speech. It requires licensed medical centers, such as Plaintiff PCC and similar NIFLA members, to post a disclosure referring women and making arrangements for them to receive referrals for abortion. The Act requires unlicensed non-medical pregnancy centers, such as Plaintiff Fallbrook and similar NIFLA members, to place in all "digital" advertisements and post within their facilities disclosures telling women they have no medical licenses, even though those centers need no medical licenses since they are not offering medical services (and don't pretend to).

In compelling this speech, the Act interferes with the heart of Plaintiffs' freedom of speech. Forcing licensed Plaintiff centers to tell women where and how to arrange an abortion makes them promote the very opposite of their message. Unlicensed centers, in turn, must clutter or preclude their advertising altogether due to posting the long and prominent disclaimers. Those disclaimers, both in ads and at their facilities, force the Plaintiffs to begin their expressive relationship with a client with an immediate negative message that Plaintiffs

would not express in that way at that time. The message strongly suggests that Plaintiffs are unqualified to provide their information because they are not licensed physicians. This is false, however, because the unlicensed Plaintiff centers need no license since they provide no medical services. They are fully competent to share their viewpoint and personal help to women to aid them in choosing better options than abortion. The Supreme Court recognized in *Riley* that forcing a speaker to begin his relationship with an unwanted disclosure imposes a severe harm to speech rights because it may end the communicative relationship before it begins. 487 U.S. at 799–800.

For these reasons, the Act by definition impacts First Amendment interests.

**B. The Act Is Subject to Strict Scrutiny as Content - and Viewpoint-Based Regulation.**

The Act is subject to strict scrutiny for several reasons. First, it regulates speech on the basis of content and viewpoint. "The First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Police Dept. of City of Chi. v. Mosley*, 408 U.S. 92, 95 (1972); *see also R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992) ("Content-based regulations are presumptively invalid."); *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 116 (1991) (invalidating statute that "plainly imposes a financial disincentive only on speech of a particular content"). Content-based burdens on speech are reviewed with the same rigorous scrutiny as content-based bans on certain speech. *Sorrell v. IMS Health*, 131 S. Ct. 2653, 2664 (2011).

1    The Act is expressly content based due to the simple fact that it imposes a

2    disclosure of specific content. Plaintiffs must say what the Act says they must

3    say. That by definition prescribes speech of a specific content. It is subject to

4    strict scrutiny. *See Riley*, 487 U.S. at 791 (requiring charitable solicitors to engage

5    in disclosures triggers "our test for fully protected expression"); *see also*

6    *Evergreen*, 740 F.3d at 249 ("mandating the manner in which the discussion of

7    these issues begins" constitutes a content-based regulation). Indeed, the California

8    Assembly Health Committee itself noted that "[t]he Committee's analysis of the

9    free speech issues indicates that the licensed facility notice is content-based...."

10   Bill analysis, *available at* http://www.leginfo.ca.gov/pub/1516/bill/asn/ab_075

11   10800/ab_775_cfa_20150425_202527_asm_comm.html (last accessed Oct. 6,

12   2015); *see also id.* (same conclusion for unlicensed facilities).

13       The Act is also content based because its application turns on whether

14   centers discuss one particular issue: pregnancy. "Government regulation of

15   speech is content based if a law applies to particular speech because of the topic

16   discussed or the idea or message expressed." *Reed v. Town of Gilbert*, 135 S. Ct.

17   2218, 2227 (2015). Here, the Act's terms explicitly depend on whether a facility

18   offers pregnancy-related speech and services, but not primarily information and

19   services focused on any other issue. *See* Exh. A at 2 (regulating licensed medical

20   centers only if their "primary purpose is providing family planning or pregnancy-

21   related services," including, among other things, "counseling about"

22   contraceptive methods); *id.* at 3 (regulating unlicensed centers only if their

23   "primary purpose is providing pregnancy-related services" including, among

11

"pregnancy options counseling"). If Plaintiffs wanted to talk about and offer free help on any other issue, such as drug use, diet, or AIDS, the content of that purpose would not trigger the Act's compelled disclosures. Consequently, the Act on its face distinguishes Plaintiffs' speech and activity based on the basis of the ideas they express, and therefore it is content-based. *See Turner Broadcasting System, Inc. v. FCC*, 512 U.S. 622, 643 (1994).

Moreover, the Act is subject to strict scrutiny for discriminating on the basis of viewpoint. Viewpoint discrimination is "an egregious form of content discrimination" and a "blatant" First Amendment violation. *Rosenberger v. Rectors and Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995). Such viewpoint-based speech restrictions, i.e., those "based on hostility—or favoritism—towards the underlying message expressed," are impermissible under the First Amendment. *R.A.V.*, 505 U.S. at 386; *see also Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 46 (1983) (holding that the government cannot "suppress expression merely because public officials oppose the speaker's view").

The Act is viewpoint-based because it requires licensed facilities to promote abortion. The Supreme Court has made clear that "[t]he government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Rosenberger,* 515 U.S. at 829. The Act forces licensed Plaintiff facilities, who are pro-life expressive organizations, to give women information about where they can get free abortions. This steps into the ideologically charged abortion debate

and uses the government to force pro-life groups to promote abortion. But the government does not force abortion facilities to tell women where they can get free help to not choose abortion. This is a blatant viewpoint motivated intervention into the abortion debate. As the Second Circuit noted in striking down mandatory disclosures explicitly mentioning abortion in *Evergreen*, "the context is a public debate over the morality and efficacy of contraception and abortion, for which many of the facilities regulated by [the law] provide alternatives." 740 F.3d at 249.

The Act is also viewpoint-based because it exempts facilities that offer certain family planning and Medi-Cal services. *See* Exh. A at 3. Those services inherently favor the abortion rights side of the debate. Medi-Cal covers abortion and considers it part and parcel with family planning.[2] For this reason, Plaintiff pro-life centers are not part of these programs, but abortion facilities are. The Act steps into the highly politically charged abortion debate, and then exempts centers that do abortions and comprehensive "family planning" from its regulation of pro-life centers. This is impermissible viewpoint discrimination.

No lesser doctrines of scrutiny apply to save the Act's regulation of speech from heightened scrutiny. "Commercial speech" does not apply to Plaintiffs. It is defined as speech which does no more than "propose a commercial transaction," or that "relates solely to the economic interests of the speaker and its audience."

---

[2] *See* Medi-Cal, "Abortions," *available at* https://files.medi-cal.ca.gov/pubsdoco/publications/masters-mtp/part2/abort_m00o03.doc (last accessed Oct. 12, 2015).

13

1    *Bd. of Trustees of the State Univ. of New York v. Fox*, 492 U.S. 469 (1989); *Cent.*

2    *Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S. 557, 561–62 (1980).

3    Plaintiffs are non-profit organizations that offer their information and services

4    entirely free of charge. They have no economic interests in their speech or free

5    services, and their expressive activity does much more than merely propose

6    commercial transactions.

7          Likewise the Act does not receive lesser scrutiny as "professional

8    conduct." In *Pickup v. Brown*, 740 F.3d 1208, 1229 (9th Cir. 2013), the court

9    deemed a ban on a certain kind of psychological treatment to be subject to lower

10   scrutiny because it constituted a regulation of conduct not speech. Here the Act

11   does not ban conduct, it explicitly compels certain speech, and consequently is

12   not subject to the lesser scrutiny used in *Pickup*. Moreover, *Pickup* observed that

13   licensed medical professionals are entitled to full First Amendment protection

14   when they are engaged on important public issues. *Id.* at 1227. The Act's

15   disclosure—telling women where to get free abortions—is the epitome of a public

16   issue. The Act does not impose that speech as a requisite to obtaining consent for

17   surgery, such as occurred in *Planned Parenthood v. Casey*, 505 U.S. 833, 884

18   (1992), where telling a woman the risks of abortion could be required before she

19   undergoes an abortion. Here the Act forces the licensed Plaintiffs to speak in

20   favor of abortion because they *are not* performing an abortion. Then the Act

21   refuses to impose that same disclosure on family planning and Medi-Cal program

22   participants, *i.e.*, abortion providers. This is the opposite situation as *Casey*. Nor

23   is the Act requiring women to know a fact about ultrasounds that is requisite to

Plaintiffs performing an ultrasound (such as medical studies about the potential risks of ultrasounds). The Act is instead an attempt to tell pro-life doctors that if they want to give women free counseling, help or ultrasounds so they might not choose abortion, they must promote abortion. That mandate is subject to strict scrutiny under the First Amendment.

**C. The Act fails strict scrutiny.**

*1. Most pregnancy center disclosure laws have been enjoined.*

"Serious questions going to the merits and hardship balance [] tips sharply towards [plaintiffs]" in this case. *Angelotti*, 791 F.3d at 1081. This is seen by the fact that courts considering laws mandating disclosures by pro-life pregnancy centers have all resulted in injunctions against all or part of the disclosures.

In *Centro Tepeyac*, 5 F. Supp. 3d. at 769–70, the court granted summary judgment and permanent injunctive relief against a disclosure requiring a center to tell women they are not licensed medical providers and that the government recommends women seek other care. In *Evergreen*, 740 F.3d at 250–51, the Second Circuit struck down disclosures requiring centers to speak about abortion and tell women that the government favors services elsewhere. In *Austin Lifecare, Inc. v. City of Austin*, No. 1:11-cv-00875-LY (W.D. Tex. June 23, 2014), the court issued a permanent injunction against a disclosure whether centers offer licensed medical services. And in *O'Brien v. Mayor & City Council of Baltimore*, 768 F. Supp. 2d 804, 817 (D. Md. 2011), the court granted summary judgment and permanent injunctive relief against disclosures discussing abortion and birth control. The Fourth Circuit reversed *O'Brien* not on the merits but to remand for

15

discovery which had not been allowed before summary judgment, while the circuit simultaneously affirmed the preliminary injunction awarded in *Centro Tepeyac* because that District Court had left the case open for discovery. *See Greater Baltimore Ctr. for Pregnancy Concerns, Inc. v. Mayor & City Council of Baltimore*, 721 F.3d 264 (4th Cir. 2013), *Centro Tepeyac v. Montgomery Cnty.*, 722 F.3d 184, 193 (4th Cir. 2013). The injunction in *Centro Tepeyac* became a permanent injunction striking the entire set of disclosures in that case under strict scrutiny. 5 F. Supp. 3d. at 769–70.

### 2. The Act does not serve a compelling interest.

Strict scrutiny review under the First Amendment requires that the Act "be narrowly tailored to promote a compelling government interest." *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 813 (2000). "A statute is narrowly tailored if it targets and eliminates no more than the exact source of the evil it seeks to remedy" *Frisby v. Schultz*, 487 U.S. 474, 485 (1988) (internal citations omitted). "If a less restrictive alternative would serve the Government's purpose, the legislature must use that alternative." *Playboy Entm't Grp., Inc.*, 529 U.S. at 813 (2000). The State's burden to "demonstrate a compelling interest and show that it has adopted the least restrictive means of achieving that interest is the most demanding test known to constitutional law." *City of Boerne v. Flores*, 521 U.S. 507, 534 (1997). Viewpoint and content-based speech restrictions are presumed unconstitutional. *Playboy*, 529 U.S. at 817–18.

The compelling interest test can only be satisfied when the law at issue serves interests "of the highest order." *Church of the Lukumi Babalu Aye, Inc. v.*

1 *City of Hialeah,* 508 U.S. 520, 546 (1993). The determination of whether an

2 asserted interest meets this test "is not to be made in the abstract" but rather "in

3 the circumstances of this case" by looking at the particular "aspect" of the interest

4 as "addressed by the law at issue." *See Cal. Democratic Party v. Jones*, 530 U.S.

5 567, 584 (2000); *see also Lukumi*, 508 U.S. at 546 (rejecting assertion that

6 protecting public health was compelling interest "in the context of these

7 ordinances"). "Only the gravest abuses, endangering paramount interests, give

8 occasion for permissible limitation" of the fundamental right to free speech.

9 *Thomas v. Collins*, 323 U.S. 516, 530 (1945). The State "must demonstrate that

10 the recited harms are real, not merely conjectural, and that the regulation will in

11 fact alleviate these harms in a direct and material way." *Turner I*, 512 U.S. at 664*;*

12 *Consol. Edison Co. of N.Y. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 530, 543

13 (1980) ("Mere speculation of harm does not constitute a compelling state

14 interest.").

15    The compelling interest test cannot be satisfied where, as here, the

16 government "fails to enact feasible measures to restrict other conduct producing

17 substantial harm or alleged harm of the same sort." *Lukumi*, 508 U.S. at 546–47.

18 Rather, "a law cannot be regarded as protecting an interest 'of the highest order'

19 when it leaves appreciable damage to that supposedly vital interest unprohibited."

20 *Id.* And the government "must present more than anecdote and supposition" to

21 support a speech regulation, but instead must prove the existence of the alleged

22 concern underlying the law based on substantial evidence. *Playboy*, 529 U.S. at

23 822; *Turner Broad. Sys., Inc. v. FCC* ("*Turner II*"),_520 U.S. 180, 195 (1997).

17

The Act fails this test. First, neither the Act nor the Defendants can identify any compelling interest that would support the law. There is no specific evidence, much less compelling proof, that the Plaintiffs are engaged in a wrongdoing. Indeed, the Act's disclosures contain no requirement that a center has engaged in wrongdoing before they are subject to the disclosures. The Act is a quintessential prophylactic measure. Furthermore, the government has no evidence of actual harm resulting from pro-life pregnancy centers as a result of failing to recite the Act's disclosures. To meet the compelling interest test, the Act would need to show that actual women are being harmed by not receiving these disclosures from Plaintiffs. No such evidence exists, much less evidence of harm of "the highest order."

"When the Government defends a regulation on speech as a means to redress past harms or prevent anticipated harms, it must do more than simply posit the existence of the disease sought to be cured." *Turner Broadcasting System, Inc. v. F.C.C.*, 512 U.S. 622, 664 (1994). Rather, Defendants "must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way." *Id.* Throughout the legislative history of the Act, there was no quantifiable evidence presented of women suffering actual harm from the activities of pro-life pregnancy centers, licensed or unlicensed. Not even the findings contained in the Act allege any harm to women justifying restrictions on providers of pregnancy-related services. *See* Exh. A at 1–2. This is insufficient to justify a sweeping restriction on all pregnancy centers in California.

The only evidence underlying the Act was a biased, unscientific "report" supplied by a partisan organization in the political debate about abortion: NARAL Pro-Choice California (the pro-abortion rights organization which co-sponsored the bill). *See* NARAL Pro-Choice California, Unmasking Fake Clinics, *available at* http://www.prochoiceamerica.org/ca-cpcs/full-report-un.html (last accessed Oct. 7, 2015) (hereinafter "NARAL Report"), as well as a similar "report" released by the University of California, Hastings College of Law on strategies to restrict pro-life pregnancy centers.[3] Neither of these reports are scientific or come close to constituting reliable evidence of a compelling nature. The UC Hastings report only discussed methods of restricting pregnancy help organizations—it did not point to any harms allegedly caused by such organizations.

The NARAL report cited no sources for its accusation that pregnancy centers in California "fraudulently present themselves as medical offices," "trained to lie," or "only have one agenda: stop any woman from accessing abortion care." NARAL Report at 1–2. None of these baseless allegations are demonstrated regarding Plaintiffs themselves. And none of those allegations are elements of the Act that must be met before the disclosures apply. The only citation contained in the entire report was to a NARAL Pro-Choice America publication. *See id.* Nowhere did this report even allege actual harm to any woman, but merely repeated the observations of its pro-abortion rights

---

[3]  *See* Pregnancy Resource Centers: Ensuring Access and Accuracy of Information, Public Law Research Institute UC Hastings College of the Law, *available at* https://www.heartbeatinternational.org/pdf/CrisisCenter Regulation_Final.pdf (last accessed Oct. 6, 2015).

"investigator." This sparse and extremely biased report is insufficient to support legislation severely restricting the free speech rights of pro-life pregnancy centers

The government can offer no evidence that the compelled speech requirement is "actually necessary" to a "solution" for this problem about which it has no evidence. *See Brown*, 131 S. Ct. at 2738. Without any evidence of actual harm, or even alleged harm, by actual women who visited the centers regulated under the Act, the State of California cannot show that the Act is "actually necessary" to protect women's health.

Moreover, California has not sought to restrict the activities of other organizations providing pregnancy-related services. It exempts groups that participate in certain family planning or Medi-Cal programs that include abortion, as abortion facilities do. It also defines licensed and unlicensed centers in a gerrymandered way to focus on the service model of pro-life facilities while not, for example, applying to everyone who performs an obstetric ultrasound. This leaves "appreciable damage to th[e government's] supposedly vital interest unprohibited." *Lukumi*, 508 U.S. at 546–47. It also betrays the Act's viewpoint based nature because disclosures run only in favor of abortion but not in favor of alternatives, *i.e.*, no licensed center is forced to tell women about *alternatives to* an abortion, just about *getting an* abortion. The Act's express exemption for all providers of certain family planning services and Medi-Cal effectively exempts abortion providers from the Act even though they primarily provide pregnancy-related services and would otherwise be regulated. The government therefore exempts an entire subset of pregnancy provider's from the Act which purports to

1    serve its interests by regulating providers of pregnancy-related services.

2            **3. The Act is not narrowly tailored to California's alleged**
3                **interests.**

4            The Act additionally fails strict scrutiny because the Act is not narrowly

5    tailored nor is it the least restrictive means of achieving any compelling interest.

6    The State bears the burden of demonstrating that there are no less restrictive

7    alternatives that would further its alleged interests. *See Playboy*, 529 U.S. at 813.

8    "A statute is narrowly tailored if it targets and eliminates no more than the exact

9    source of the 'evil' it seeks to remedy." *Frisby*, 487 U.S. at 485.

10           First, the State has completely failed to pursue a wide range of less

11   restrictive alternatives, because it has simply never chosen to send the allegedly

12   compelling messages mandated by the Act with its own voice, its own funds, its

13   own walls, or its own employees. As the Supreme Court has explained, "[b]road

14   prophylactic rules in the area of free expression are suspect. Precision of

15   regulation must be the touchstone in an area so closely touching our most

16   precious freedoms." *Riley*, 487 U.S. at 801 (internal quotations and citations

17   omitted). "In contrast to the prophylactic, imprecise, and unduly burdensome"

18   Act adopted by the California Legislature, "more benign and narrowly tailored

19   options are available." *See id.* at 800. In *Riley*, the law at issue compelled

20   professional fundraisers to disclose certain information at the beginning of a call,

21   and the government asserted an interest in ensuring that donors are made aware of

22   certain financial information concerning professional fundraisers. Rejecting the

23   State's attempt to require even professional fundraisers to provide this

21

information to donors over the telephone, the Court explained that the government can spread this message itself: "[f]or example, as a general rule, the State may itself publish the detailed [information it wants the public to know]. This procedure would communicate the desired information to the public without burdening the speaker with unwanted speech during the course of a solicitation." *Riley*, 487 U.S. at 800.

Nothing prevents the Defendants from publishing the information they seek to publicize about pregnancy centers. But they have instead chosen to impose speech on private ideological speakers. In this regard, the disclosure for licensed centers, which lists the services available from the government and requires referral for such services, is particularly troublesome. As noted in *Evergreen*, there is "concern[] that th[e] disclosure[s] require pregnancy services centers to advertise on behalf of the government." 740 F.3d at 250. Requiring licensed medical centers to speak about government services "affirmatively espouse[s] the government's position on a contested public issue" and "deprives Plaintiffs of their right to communicate freely on matters of public concern." *Id*. at 251 (internal citations omitted). The government has the ability to communicate these allegedly compelling messages, but has refused to do so. The Act is therefore not narrowly tailored.

The Act also fails the narrow tailoring inquiry because it does not "target[] and eliminate[] no more than the exact source of the 'evil' it seeks to remedy." *Frisby,* 487 U.S. at 485. The Act is a prophylactic speech restriction, which applies to all pregnancy centers across the board, without reference to whether

such a center has engaged in, or even been accused of, wrongdoing. There need not be even an allegation of misleading tactics, delivery of misinformation, or any misdeeds before the Act's restrictions take effect. The Act seeks to restrict speech without specifically targeting any alleged wrongdoing, and therefore fails narrow tailoring.

Moreover, the Supreme Court has explained that "[i]f the First Amendment means anything, it means that regulation of speech *must* be a last-not first resort. Yet here it seems to have been the first strategy the Government thought to try." *Thompson. v. W. States Med. Ctr.*, 535 U.S. 357, 373 (2002). The state's use of compelled speech as "the first strategy" it thought to try, and its failure to pursue (or apparently even consider) the other available options, ends the analysis. So long as there is another mechanism for the government to convey its message, the Act cannot survive strict scrutiny. *Playboy*, 529 U.S. at 813 ("If a less restrictive alternative would serve the Government's purpose, the legislature must use that alternative.") For these reasons, the Act fails under the Free Speech Clause.

## II.     PLAINTIFFS HAVE DEMONSTRATED A LIKELIHOOD OF SUCCESS ON THE MERITS OF THEIR FREE EXERCISE CLAIM.

The First Amendment's Free Exercise of Religion Clause also requires the government to satisfy strict scrutiny (which, as discussed above, it cannot do) because the Act burdens an organization's exercise of religion, and it does so in conjunction with exercising its rights of speech. Under *Lukumi*, 508 U.S. at 531, "[a] law burdening religious practice that is not . . . of general application must undergo" strict scrutiny. The Act is subject to strict scrutiny because it is not

generally applicable. It exempts Medi-Cal and Family PACT providers from its restrictions, as well as federal healthcare facilities. It also fails to apply to many practitioners that offer ultrasounds or other pregnancy services, because of the multi-factor way in which the definition of a licensed or unlicensed facility is gerrymandered to focus on the actual practice of pro-life pregnancy centers. This leaves many pregnant women without the disclosures.

Likewise under *Employment Division v. Smith*, 494 U.S. 872 (1990), "strict scrutiny is imposed in 'hybrid situation[s]' in which a law 'involve[s] not the Free Exercise Clause alone, but the Free Exercise Clause in conjunction with other constitutional protections," exempting such "hybrid rights" from *Smith's* general "rational basis test." *Miller v. Reed*, 176 F.3d 1202, 1207 (9th Cir 1999) (citing *Smith*, 494 U.S. at 881–82).   In order to assert a religious exercise claim in conjunction with free speech, "a free exercise plaintiff must make out a 'colorable claim' that a companion right has been violated-that is, a 'fair probability' or a 'likelihood,' but not a certitude, of success on the merits." *Id.* (citing *Thomas v. Anchorage Equal Rights Commission,* 165 F.3d 692, 703, 707 (9th Cir. 1999). As discussed in detail above, the Plaintiffs have established that the Act violates Plaintiffs' First Amendment right to freedom of speech. At minimum, in light of other courts enjoining similar laws, this requires strict scrutiny as a hybrid claim under *Miller*, and Plaintiffs have a likelihood of success under strict scrutiny.

### III.   PLAINTIFFS SATISFY ALL INJUNCTION FACTORS.

Plaintiffs will suffer irreparable harm absent an injunction. Any loss of constitutional rights is presumed to be irreparable injury. *Elrod v. Burns*, 427 U.S. 347, 373 (1976). The Act requires Plaintiffs to engage in government-required speech, in violation of their First Amendment right to freedom of speech, as well as Plaintiffs' rights under the Free Exercise Clause of the First Amendment.

The balance of hardships sharply favors the Plaintiffs. Plaintiffs' and other citizens' hardships if the injunction is not granted far outweigh the State's if the injunction is granted. The State will suffer little, if any, harm if an injunction is issued, especially since the state could serve its interests by other means. Plaintiffs' First Amendment free speech and free exercise rights will be burdened by the government's compelled speech regulations if an injunction does not issue, irreparably harming Plaintiffs and similarly situated organizations.

An injunction serves the public interest. "[F]ree speech 'serves significant societal interests'. . . . By protecting those who wish to enter the marketplace of ideas from government attack, the First Amendment protects the public's interest in receiving information." *Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n of Cal.,* 475 U.S. 1, 8 (1986). There is no public "interest in the enforcement of an unconstitutional law." *ACLU v. Ashcroft,* 322 F.3d 240, 251 n. 11 (3d Cir. 2003).

### CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court enter a preliminary injunction against enforcement of the Act.

Respectfully submitted on this 21st day of October, 2015

*s/ David J. Hacker*_____
DAVID J. HACKER
California Bar No. 249272
Illinois Bar No. 6283022
ALLIANCE DEFENDING FREEDOM
101 Parkshore Drive, Suite 100
Folsom, California 95630
(916) 932–2850
dhacker@ADFlegal.org

MATTHEW S. BOWMAN*
D.C. Bar No. 993261
Michigan Bar No. P66239
ALLIANCE DEFENDING FREEDOM
440 First Street, NW, Suite 600
Washington, DC 20001
(202) 393-8690
mbowman@adflegal.org

KEVIN H. THERIOT*
Arizona Bar No. 030446
Florida Bar No. 0136761
Georgia Bar No. 373095
Kansas Bar No. 21565
Missouri Bar No. 55733
Tennessee Bar No. 015049
Texas Bar No. 00788908
Virginia Bar No. 38324
ELISSA M. GRAVES*
Arizona Bar No. 030670
Texas Bar No. 24090135
ALLIANCE DEFENDING FREEDOM
15100 N. 90th St.
Scottsdale, AZ 85260
(480) 444-0020
ktheriot@adflegal.org

26

egraves@adflegal.org

DEAN R. BROYLES**
California Bar No. 179535
THE NATIONAL CENTER FOR LAW AND
    POLICY
539 West Grand Avenue
Escondido, California 92025
(760) 747-4529
dbroyles@nclplaw.org

ANNE O'CONNOR**
California Bar No. 135341
New Jersey Bar No. 7371997
NATIONAL INSTITUTE OF FAMILY AND LIFE
    ADVOCATES
5601 Southpoint Centre Blvd.
Fredericksburg, VA 22407
(540) 372-3930
AOConnor@nifla.org


Attorneys for Plaintiffs

*Application for Admission Pro Hac Vice
forthcoming

** Notice of Appearance forthcoming

27

**CERTIFICATE OF SERVICE**

I hereby certify that on October 21, 2015, I electronically filed the foregoing paper with the Clerk of Court using the ECF system, and I hereby certify that I have mailed by United States Postal Service the paper to the following non-ECF participants:

Thomas Montgomery
County Counsel for San Diego County
Office of the County Counsel
1600 Pacific Hwy Room 402
San Diego, CA 92108

Morgan Foley
City Attorney for the City of El Cajon
City of El Cajon Attorney
200 Civic Center Way
El Cajon, CA 92020

Kamala Harris
Attorney General for the State of California
Office of the Attorney General
600 West Broadway Suite 1800
San Diego, CA 92101

Edmund G. Brown, Jr.
Governor of the State of California
Office of the Governor
c/o State Capitol Suite 1173
Sacramento, CA 95814

*s/ David J. Hacker*
DAVID J. HACKER

28