

**FILED**

Dec 28 2016

**CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA**
BY ___s/ AKR___ DEPUTY

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

**FILED**

DEC 28 2016

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| NATIONAL INSTITUTE OF FAMILY AND LIFE ADVOCATES, a Virginia corporation, DBA NIFLA; et al., | No. 16-55249 |
| Plaintiffs - Appellants, | D.C. No. 3:15-cv-02277-JAH-DHB |
| | U.S. District Court for Southern California, San Diego |
| v. | |
| KAMALA HARRIS, in her official capacity as Attorney General for the State of California; et al., | **MANDATE** |
| Defendants - Appellees. | |

The judgment of this Court, entered October 14, 2016, takes effect this date.

This constitutes the formal mandate of this Court issued pursuant to Rule 41(a) of the Federal Rules of Appellate Procedure.

FOR THE COURT:

MOLLY C. DWYER
CLERK OF COURT

By: Margoth Turcios
Deputy Clerk
Ninth Circuit Rule 27-7

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| NATIONAL INSTITUTE OF FAMILY AND LIFE ADVOCATES, a Virginia corporation, DBA NIFLA; PREGNANCY CARE CENTER, a California corporation, DBA Pregnancy Care Clinic; FALLBROOK PREGNANCY RESOURCE CENTER, a California corporation, *Plaintiffs-Appellants*, <br><br> v. <br><br> KAMALA HARRIS, in her official capacity as Attorney General for the State of California; THOMAS MONTGOMERY, in his official capacity as County Counsel for San Diego County; MORGAN FOLEY, in his official capacity as City Attorney for the City of El Cajon, CA; EDMUND G. BROWN, JR., in his official capacity as Governor of the State of California, *Defendants-Appellees.* | No. 16-55249 <br><br> D.C. No. 3:15-cv-02277-JAH-DHB <br><br><br> OPINION |

Appeal from the United States District Court
for the Southern District of California
John A. Houston, District Judge, Presiding

2                    NIFLA v. HARRIS

Argued and Submitted June 14, 2016
San Francisco, California

Filed October 14, 2016

Before: Dorothy W. Nelson, A. Wallace Tashima,
and John B. Owens, Circuit Judges.

Opinion by Judge D.W. Nelson

---

**SUMMARY**[*]

---

**Civil Rights**

The panel affirmed the district court's denial of a motion for a preliminary injunction sought by three religiously-affiliated non-profit corporations to prevent the enforcement of the California Reproductive Freedom, Accountability, Comprehensive Care, and Transparency Act.

The Act requires that licensed pregnancy-related clinics disseminate a notice stating the existence of publicly-funded family-planning services, including contraception and abortion. The Act also requires that unlicensed clinics disseminate a notice stating that they are not licensed by the State of California. Appellants alleged that the Act violates their fundamental rights, including their First Amendment guarantees to free speech and the free exercise of religion.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

As a threshold matter, the panel held that appellants' claims were constitutionally and prudentially ripe. Addressing the free speech claim, the panel concluded that the proper level of scrutiny to apply to the Act's regulation of licensed clinics was intermediate scrutiny, which the Act survived.   With respect to unlicensed clinics, the panel concluded that the Act survived any level of scrutiny.

The panel also rejected appellants' arguments that they were entitled to a preliminary injunction based on their free exercise claims.  The panel held that the Act is a neutral law of general applicability, which survived rational basis review. The panel concluded that appellants were unable to demonstrate a likelihood of success on the merits of their First Amendment claims.

## COUNSEL

Matthew Bowman (argued) and David A. Cortman, Alliance Defending Freedom, Washington, D.C.; Dean R. Broyles, National Center for Law and Policy, Escondido, California; Kristen K. Waggoner, Kevin H. Theriot, and Elissa M. Graves, Alliance Defending Freedom, Scottsdale, Arizona; Anne O'Connor, National Institute of Family and Life Advocates, Fredericksburg, Virginia; for Plaintiffs-Appellants.

Jonathan M. Eisenberg (argued), Office of the Attorney General, Los Angeles, California, for Defendants-Appellees Kamala Harris and Edmund G. Brown, Jr.

Thomas D. Bunton (argued), Senior Deputy; Thomas E. Montgomery, County Counsel; Office of County Counsel, San Diego, California; for Defendant-Appellee Thomas Montgomery.

Carrie L. Mitchell, McDougal Love Eckis Boehmer & Foley, La Mesa, California, for Defendant-Appellee Morgan Foley.

Deborah J. Dewart, Swansboro, North Carolina; James L. Hirsen, Anaheim Hills, California; for Amicus Curiae Justice and Freedom Fund.

Kristen Law Sagafi and Martin D. Quiñones, Tycko & Zavareei LLP, Oakland, California, for Amicus Curiae Physicians for Reproductive Health.

Priscilla Joyce Smith, Brooklyn, New York, for Amicus Curiae Information Society Project at Yale Law School.

## OPINION

D.W. NELSON, Circuit Judge:

The National Institute of Family and Life Advocates, et al. appeal from the district court's denial of their motion for a preliminary injunction to prevent the enforcement of the California Reproductive Freedom, Accountability, Comprehensive Care, and Transparency Act (the FACT Act or the Act). The Act requires that licensed pregnancy-related clinics disseminate a notice stating the existence of publicly-funded family-planning services, including contraception and abortion. The Act also requires that unlicensed clinics disseminate a notice stating that they are not licensed by the State of California. Appellants allege that the Act violates their fundamental rights, including their First Amendment guarantees to free speech and the free exercise of religion.

We affirm the district court's denial of Appellants' motion for a preliminary injunction. For the free speech claim, we conclude that the proper level of scrutiny to apply to the Act's regulation of licensed clinics is intermediate scrutiny, which it survives. With respect to unlicensed clinics, we conclude that the Act survives any level of scrutiny. For the free exercise claim, we conclude that the Act is a neutral law of general applicability, and that it survives rational basis review. Appellants, therefore, are unable to show the "most important" factor under *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008): likelihood of success on the merits. *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (en banc).

## BACKGROUND

### I.  The FACT Act

The FACT Act was created for the stated purpose of ensuring that "[a]ll California women, regardless of income, . . . have access to reproductive health services." Assem. Bill No. 775 § 1(a).   It was enacted after the California Legislature found that a great number of California women were unaware of the existence of state-sponsored healthcare programs.  *See id.* at § 1 (a)–(c).  These programs, which expanded under the Patient Protection and Affordable Care Act to include millions of California women, provide "low-income women . . . immediate access to free or low-cost comprehensive family planning services and pregnancy-related care."  *Id.* at § 1(c); *see also* Assem. Comm. on Health, Analysis of Assembly Bill No. 775.  Specifically, the Legislature found that:

> Millions of California women are in need of publicly funded family planning services, contraception services and education, abortion services, and prenatal care and delivery.  In 2012, more than 2.6 million California women were in need of publicly funded family planning services.   More than 700,000 California women become pregnant every year and one-half of these pregnancies are unintended.  In 2010, 64.3 percent of unplanned births in California were publicly funded.  Yet, at the moment they learn that they are pregnant, thousands of women remain unaware of the public programs available to provide them with contraception,

health education and counseling, family planning, prenatal care, abortion, or delivery.

*Id.* at § 1(b).

The Legislature also found that the ability of California women to receive accurate information about their reproductive rights, and to exercise those rights, is hindered by the existence of crisis pregnancy centers (CPCs). CPCs "pose as full-service women's health clinics, but aim to discourage and prevent women from seeking abortions" in order to fulfill their goal of "interfer[ing] with women's ability to be fully informed and exercise their reproductive rights." Assem. Comm. on Health, Analysis of Assembly Bill No. 775 at 3. The Legislature found that CPCs, which include unlicensed and licensed clinics, employ "intentionally deceptive advertising and counseling practices [that] often confuse, misinform, and even intimidate women from making fully-informed, time-sensitive decisions about critical health care." *Id.* There are approximately 200 CPCs in California. *Id.*

Because "pregnancy decisions are time sensitive, and care early in pregnancy is important," the Legislature found that the most effective way to ensure that women are able to receive access to family planning services, and accurate information about such services, was to require licensed pregnancy-related clinics unable to enroll patients in state-sponsored programs to state the existence of these services. Assem. Bill No. 775 § 1(c)–(d).

Thus, as required under the Act, all licensed covered facilities must disseminate a notice (the Licensed Notice) stating, "California has public programs that provide

immediate free or low-cost access to comprehensive family planning services (including all FDA-approved methods of contraception), prenatal care, and abortion for eligible women. To determine whether you qualify, contact the county social services office at [insert the telephone number]." Cal. Health & Safety Code § 123472(a)(1). The Act defines a licensed covered facility as "a facility licensed under Section 1204 or an intermittent clinic operating under a primary care clinic pursuant to subdivision (h) of Section 1206, whose primary purpose is providing family planning or pregnancy-related services," and that also satisfies two or more of the following criteria:

> (1) The facility offers obstetric ultrasounds, obstetric sonograms, or prenatal care to pregnant women. (2) The facility provides, or offers counseling about, contraception or contraceptive methods. (3) The facility offers pregnancy testing or pregnancy diagnosis. (4) The facility advertises or solicits patrons with offers to provide prenatal sonography, pregnancy tests, or pregnancy options counseling. (5) The facility offers abortion services. (6) The facility has staff or volunteers who collect health information from clients.

*Id.* § 123471. The Act requires that the Licensed Notice be disclosed by licensed facilities in one of three possible manners:

> (A) A public notice posted in a conspicuous place where individuals wait that may be easily read by those seeking services from the

> facility.  The notice shall be at least 8.5 inches
> by 11 inches and written in no less than 22-
> point type.  (B) A printed notice distributed to
> all clients in no less than 14-point type.  (C) A
> digital notice distributed to all clients that can
> be read at the time of check-in or arrival, in
> the same point type as other digital
> disclosures.

*Id.* § 123472(a)(2).

The Act also covers unlicensed facilities.  An unlicensed clinic is "a facility that is not licensed by the State of California and does not have a licensed medical provider on staff or under contract who provides or directly supervises the provision of all of the services, whose primary purpose is providing pregnancy-related services" and that also satisfies two of the following criteria:

> (1)  The  facility  offers  obstetric
> ultrasounds, obstetric sonograms, or prenatal
> care  to  pregnant  women. (2)  The  facility
> offers  pregnancy  testing  or  pregnancy
> diagnosis. (3)  The  facility  advertises  or
> solicits patrons with offers to provide prenatal
> sonography,  pregnancy  tests,  or  pregnancy
> options counseling. (4) The facility has staff
> or volunteers who collect health information
> from clients.

*Id.* § 123471(b).  Unlicensed clinics must disseminate a notice (the Unlicensed Notice) stating, "This facility is not licensed as a medical facility by the State of California and has no licensed medical provider who provides or directly

supervises the provision of services." *Id.* § 123472(b)(1).
The Unlicensed Notice must be "disseminate[d] to clients on
site and in any print and digital advertising materials
including Internet Web sites." *Id.* § 123472(b).  Information
in advertising material must be "clear and conspicuous," and
the onsite notice must be "at least 8.5 inches by 11 inches and
written in no less than 48-point type, and . . . posted
conspicuously in the entrance of the facility and at least one
additional area where clients wait to receive services." *Id.*
§ 123472(b)(2)–(3).

All violators of the Act "are liable for a civil penalty of
five hundred dollars . . . for a first offense and one thousand
dollars . . . for each subsequent offense." *Id.* § 123473(a).

## II.  Procedural History

Appellants are three religiously-affiliated non-profit
corporations.[1]   The National Institute of Family and Life
Advocates (NIFLA) is a national organization composed of
numerous pregnancy centers, 111 of which are located in
California.   Seventy-three of the centers are licensed by the
State of California, and thirty-eight provide non-medical
services.   Pregnancy Care Clinic is a licensed clinic that
provides medical services such as ultrasounds, medical
referrals, and education on family planning.   Its staff includes
two doctors of obstetrics and gynecology, one radiologist, one
anesthesiologist, one certified midwife, one nurse
practitioner, ten nurses, and two registered diagnostic medical

---

[1] In addition to this appeal, this panel also heard argument in related
cases *A Woman's Friend Pregnancy Resource Clinic v. Harris*, No. 15-
17517, __ F. App'x __ (9th Cir. 2016), and *Livingwell Medical Clinic,
Inc. v. Harris*, No. 15-17497, __ F. App'x __ (9th Cir. 2016).

sonographers.  Fallbrook Pregnancy Center is an unlicensed clinic.  It offers services such as free pregnancy tests that patients can take themselves, educational programs, and medical referrals.  Fallbrook employs several nurses at its facility, and also contracts with a licensed medical provider for referrals for ultrasounds, which are provided in a separate mobile facility nearby.  Prenatal sonographs are also offered by a contractor in a separate facility nearby.

Appellants are strongly opposed to abortion.  None provide abortions or referrals for abortions.  NIFLA's mission is to "empower the choice for life," and Pregnancy Care Clinic "provides its services to women in unplanned pregnancies pursuant to its pro-life viewpoint, desiring to empower the women it serves to choose life for their child, rather than abortion."  Fallbrook believes "that human life is a gift of God that should not be destroyed by abortion."

On October 13, 2015, Appellants brought suit against California Attorney General Kamala Harris (the AG), California Governor Edmund G. Brown, Jr., County Counsel for San Diego County Thomas Montgomery, and City Attorney of El Cajon Morgan Foley[2] in the Southern District of California.  Appellants alleged that the FACT Act violates their First Amendment free speech and free exercise rights.[3]

---

[2] The district court's finding that the City Attorney of El Cajon is not a proper defendant was harmless error.  The Act grants the City Attorney the power to enforce the Act.  *See* Cal. Health & Safety Code § 123473. The City Attorney, therefore, is a proper defendant.

[3] Appellants' claims for relief are (1) Violation of the free speech clause of the First Amendment of the United States Constitution; (2) Violation of the due process clause of the Fourteenth Amendment of the United States Constitution (alleged by unlicensed clinics);

12                     NIFLA V. HARRIS

Appellants brought a motion for a preliminary injunction to enjoin enforcement of the Act prior to the full litigation of the action.

The district court denied Appellants' motion for a preliminary injunction. The court found that Appellants were unable to show a likelihood of success on their free speech claim. With respect to the Licensed Notice, the court held that the Act either regulated professional conduct subject to rational basis review, or professional speech subject to intermediate scrutiny, and the Act survived both levels of review. The court also held that the Act did not constitute viewpoint discrimination. With respect to the Unlicensed Notice, the court held that it withstood any level of scrutiny. In addition, Appellants could not show a likelihood of success on the merits of their free exercise claim because, the court held, the Act is a neutral law of general applicability which survived rational basis review. The court then explained that even though Appellants raised "serious questions going to the merits," *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134–35 (9th Cir. 2011), they could not demonstrate that the other *Winter* factors weighed in favor of granting a preliminary injunction.

---

(3) Violation of the free exercise clause of the First Amendment of the United States Constitution; (4) Violation of the Coats-Snowe Amendment, 42 U.S.C. § 238N (alleged by licensed clinics); and (5) Violation of the free speech clause of the California Constitution. Because Appellants brought their motion for preliminary injunction only under their federal First Amendment claims, we address only those issues in this opinion.

## STANDARD OF REVIEW

We review the grant or denial of a preliminary injunction for an abuse of discretion. *Sw. Voter Registration Educ. Project v. Shelley*, 344 F.3d 914, 918 (9th Cir. 2003) (en banc) (per curiam). We review the district court's interpretation of underlying law *de novo*. *Id.*

## ANALYSIS

## I. Appellants' Claims are Justiciable.

As a threshold matter, we must first decide whether Appellants' claims are justiciable. The County Counsel of San Diego argues that this action is not constitutionally ripe, and even if it were ripe, that we should decline to find jurisdiction for prudential reasons.

We reject these arguments.

### A. Appellants' Claims are Constitutionally Ripe.

"[T]he Constitution mandates that prior to our exercise of jurisdiction there exist a constitutional 'case or controversy,' that the issues presented are 'definite and concrete, not hypothetical or abstract.'" *Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1139 (9th Cir. 1999) (en banc) (quoting *Ry. Mail Ass'n v. Corsi*, 326 U.S 88, 93 (1945)). A plaintiff must face "a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement," not an "alleged injury [that] is too imaginary or speculative to support jurisdiction." *Id.* (internal quotation marks and citation omitted). This Court has identified three factors to assess in deciding whether a

case is constitutionally ripe: (1) whether plaintiffs have articulated a concrete plan to violate the statute in question; (2) whether the prosecuting authorities have communicated a specific warning or threat to initiate proceedings; and (3) the history of past prosecution or enforcement of the challenged statute. *Id.*

These factors allow for plaintiffs to bring pre-enforcement challenges to laws that they claim infringe their fundamental rights. *See id.* at 1137 n.1. Indeed, we have long recognized that "[o]ne does not have to await the consummation of threatened injury to obtain preventive relief . . . . [p]articularly in the First Amendment-protected speech context[.]" *Cal. Pro-Life Council, Inc. v. Getman*, 328 F.3d 1088, 1094 (9th Cir. 2003) (citation omitted); *see also Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 393 (1988).

Appellants' claims are constitutionally ripe. Before the district court and this Court, Appellants have explicitly stated that they will not comply with the Act, even if enforced. Appellants have made this pledge of disobedience although they are aware that violators of the Act are subject to civil penalties. Cal. Health & Safety Code § 123473(a). The AG, moreover, has not stated that she will not enforce the Act. *See Am. Booksellers Ass'n*, 484 U.S. at 393 ("The State has not suggested that the newly enacted law will not be enforced, and we see no reason to assume otherwise. We conclude that plaintiffs have alleged an actual and well-founded fear that the law will be enforced against them."). A lack of enforcement history is not a compelling reason to find

NIFLA v. HARRIS                                    15

Appellants' claims unripe in this context.[4]  The Act did not go into effect until January 1, 2016, approximately one month before the district court denied the motion for a preliminary injunction.   Appellants, therefore, could not have demonstrated a significant history of enforcement.   *See Wolfon v. Brammer*, 616 F.3d 1045, 1060 (9th Cir. 2010) (affording the factor of past prosecution "little weight" when the challenged law was new); *LSO Ltd. v. Stroh*, 205 F.3d 1146, 1155 (9th Cir. 2000) ("[E]nforcement history alone is not dispositive.  Courts have found standing where no one had ever been prosecuted under the challenged provision.").

B.  Appellants' Claims are Prudentially Ripe.

Even if a case is constitutionally ripe, we have discretionary power to decline to exercise jurisdiction. *Thomas*, 220 F.3d at 1142.   When assessing prudential ripeness, we consider: (1) the fitness of the issues for judicial decision and; (2) hardship to the parties if we were to withhold jurisdiction.  *Id.* at 1141.

---

[4] Moreover, we note that NIFLA filed a 28(j) letter informing the Court that, on August 16, 2016, Los Angeles City Attorney Michael Feuer sent an enforcement letter to co-counsel for NIFLA.  In the letter, the City Attorney provided notice that The People of the State of California planned to make an *ex parte* application for an order to show cause why a preliminary injunction should not issue and a temporary restraining order enjoining the Pregnancy Counseling Center, a member of NIFLA, from violating the FACT Act.  The City indicated it also would file a complaint containing a single cause of action—violation of California Business & Professions Code § 17200, *et seq.*—and seeking equitable relief and civil penalties. NIFLA states this chilled the speech of the Pregnancy Counseling Center.

This Court has stated that "[a] claim is fit for decision if the issues raised are primarily legal, do not require further factual development, and the challenged action is final." *Wolfson*, 616 F.3d at 1060 (quoting *U.S. W. Commc'ns v. MFS Intelenet, Inc.*, 193 F.3d 1112, 1118 (9th Cir. 1999)). When evaluating hardship "[w]e consider whether the 'regulation requires an immediate and significant change in plaintiffs' conduct of their affairs with serious penalties attached to noncompliance.'" *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1126 (9th Cir. 2009) (quoting *Ass'n of Am. Med. Colls. v. United States*, 217 F.3d 770, 783 (9th Cir. 2000)). "[A] litigant must show that withholding review would result in direct and immediate hardship and would entail more than possible financial loss." *Id.* (quoting *MFS Intelenet, Inc.*, 193 F.3d at 1118).

We conclude that both factors favor a finding of prudential ripeness.

This action turns on a question of law. Appellants seek to enjoin the enforcement of the Act on the grounds that it is unconstitutional. We require no further factual development to address Appellants' challenge. The district court's order denying the motion for a preliminary injunction was also an appealable order. 28 U.S.C. § 1292(a)(1).

We also conclude that the parties would face immediate and significant hardships if we were to decline to exercise jurisdiction. Until we issue a decision, Appellants must routinely choose between holding fast to their firmly held beliefs about abortion, or complying with the Act. And although the San Diego County Counsel claims that he will suffer hardship if he is forced to defend the Act, we find more significant the definite and direct hardship that all parties will

suffer if we were to decline to find jurisdiction.  As noted, without a decision, Appellants must continually choose between obeying the law or following their strongly held convictions about abortion, and the AG will have to choose whether or not to enforce a law without the benefit of a ruling on its constitutionality.

We therefore conclude that this action is justiciable and turn to the merits of the case.

## II. The District Court Did Not Abuse Its Discretion in Denying the Preliminary Injunction.

When bringing a motion for a preliminary injunction, a plaintiff must demonstrate: (1) that he is likely to succeed on the merits of his claim; (2) that he is likely to suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in his favor; and (4) that an injunction is in the public interest. *Winter*, 555 U.S. at 20.  A preliminary injunction can also be issued if  "a plaintiff demonstrates . . . that serious questions going to the merits were raised and the balance of hardships tips sharply in the plaintiff's favor," as well as satisfaction of the other *Winter* factors.  *All. for the Wild Rockies*, 632 F.3d at 1134–35 (citation omitted).

### A. Appellants Cannot Demonstrate a Likelihood of Success on their First Amendment Free Speech Claims.

Appellants argue that the Act should be subject to strict scrutiny for two main reasons.  First, they argue that because the Act compels content-based speech, strict scrutiny is

appropriate.  Second, they contend that the Act engages in viewpoint discrimination.

We disagree.  Although the Act is a content-based regulation, it does not discriminate based on viewpoint.  The fact that the Act regulates content, moreover, does not compel us to apply strict scrutiny.  And because we agree with the Fourth Circuit that the Supreme Court's decision in *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833 (1992), did not announce a rule regarding the level of scrutiny to apply in abortion-related disclosure cases, we apply our precedent in *Pickup v. Brown*, 740 F.3d 1208 (9th Cir. 2013), and rule that the Licensed Notice regulates professional speech, subject to intermediate scrutiny.[5]  The Licensed Notice survives intermediate scrutiny.  We also conclude that the Unlicensed Notice survives any level of scrutiny.  Thus, the district court did not err in finding that Appellants cannot show a likelihood of success on the merits of their free speech claims.

### 1.  Strict Scrutiny is Inappropriate.

A regulation discriminates based on content when "on its face," the regulation "draws distinctions based on the message a speaker conveys." *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2227 (2015).  A regulation discriminates based on viewpoint when it regulates speech "based on 'the specific

---

[5] We find unpersuasive Appellees' argument that the Act regulates commercial speech subject to rational basis review.  *See Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U.S. 626, 651 (1985).  Commercial speech "does no more than propose a commercial transaction." *Coyote Pub., Inc. v. Miller*, 598 F.3d 592, 604 (9th Cir. 2010) (citation omitted).  The Act primarily regulates the speech that occurs within the clinic, and thus is not commercial speech.

motivating ideology or the opinion or perspective of the speaker.'" *Id.* at 2230 (quoting *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995)). Thus, viewpoint discrimination is a kind of content discrimination. Indeed, viewpoint discrimination is a "'more blatant' and 'egregious form of content discrimination.'" *Id.* (quoting *Rosenberger*, 515 U.S. at 829).

Because viewpoint discrimination is a subset of content discrimination, a regulation can be content-based, but viewpoint neutral. Such is the case with the Act.

On its face, the Act compels Appellants to disseminate the Notices. *See id.* at 2228 (explaining that the "first step" in assessing whether a law is content-based or content-neutral is to "determine[ ] whether the law is content neutral on its face"). The Act therefore requires Appellants engage in speech on a particular subject matter. In so doing, the Act "[m]andat[es] speech that a speaker would not otherwise make" which "necessarily alters the content of the speech." *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 795 (1988). The Act, therefore, is a content-based regulation.[6]

The Act, however, does not discriminate based on viewpoint. It does not discriminate based on the particular opinion, point of view, or ideology of a certain speaker. Instead, the Act applies to all licensed and unlicensed facilities, regardless of what, if any, objections they may have to certain family-planning services. The Act contains two

---

[6] We disagree with the district court's conclusion that the Act is content-neutral. This error, however, was harmless as it appropriately denied the motion for a preliminary injunction.

narrow exceptions that do not disfavor any particular speakers. The first exemption is for clinics "directly conducted, maintained, or operated by the United States or any of its departments, officers, or agencies." Cal. Health & Safety Code § 123471(c)(1). This exemption was created in order to avoid federal preemption. The Act's second exemption is for a clinic "enrolled as a Medi-Cal provider and a provider in the Family Planning, Access, Care, and Treatment Program." *Id*. § 123472(c)(2). This exemption was created because clinics that fall under § 123472(c)(2) already provide all of the publicly-funded health services outlined in the Licensed Notice.

Appellants argue that this case is similar to *Sorrell v. IMS Health Inc.*, 564 U.S. 552 (2011), in which the Supreme Court held that a law restricting the sale and use of pharmacy records discriminated based on viewpoint and was subject to more rigorous judicial scrutiny. There, the Court looked to the law's legislative findings and concluded that the law's "express purpose" was to burden specific speakers. *Id.* at 565. Appellants assert that because the California legislature also had specific speakers in mind when enacting the Act, that is, CPCs and clinics opposed to abortion, the Act engages in viewpoint discrimination. Appellants emphasize, moreover, that California has no evidence that their clinics actually misinform women.

*Sorrell*, however, did not rely solely on legislative intent. The Court concluded that the law "on its face burden[ed] disfavored speech by disfavored speakers," allowing use of the pharmacy records by all "but a narrow class of disfavored speakers." *Id*. at 564, 573. Thus, while "a statute's stated purpose may also be considered," *Sorrell* did not turn exclusively on the law's motivation or purpose. *Id.* at 565.

Importantly, the law in *Sorrell* applied to the speakers that were the targets of the law, while it exempted others. In sharp contrast, as discussed, the Act applies to almost all licensed and unlicensed speakers. Other than the two narrow exceptions unrelated to viewpoint, the Act applies equally to clinics that offer abortion and contraception as it does to clinics that oppose those same services.

Appellants' reliance on *Conant v. Walters*, 309 F.3d 629 (9th Cir. 2002), is also misplaced. In *Conant*, we affirmed an injunction that prohibited the federal government from possibly revoking a doctor's license based on a federal policy that "not merely prohibit[ed] the discussion of marijuana," but also "condemn[ed] expression of a particular viewpoint, i.e., that medical marijuana would likely help a specific patient." *Id.* at 637.

*Conant* is distinguishable. Again, other than the two exceptions, the Act applies to all clinics, regardless of their stance on abortion or contraception. Next, unlike in *Conant*, the Act does not favor or disfavor any particular viewpoint. Indeed, contrasting this case with the Fourth Circuit's recent decision in *Stuart v. Camnitz*, 774 F.3d 238 (4th Cir. 2014), confirms that the Act does not engage in viewpoint discrimination. In *Stuart*, the Fourth Circuit held that a statute that required doctors to perform an ultrasound, display the sonogram, and describe the fetus to women seeking abortions violated the physicians' First Amendment rights. 774 F.3d at 255–56. In so doing, the Fourth Circuit concluded that the law compelled speech that "convey[ed] a particular opinion," which was, "to convince women seeking abortions to change their minds or reassess their decisions." *Id.* at 246. Here, however, the Act does not convey any opinion. The Licensed Notice and the Unlicensed Notice do

22                          NIFLA V. HARRIS

not imply or suggest any preference regarding family-planning services. Instead, the Licensed Notice merely states the existence of publicly-funded family-planning services, and the Unlicensed Notice only states that the particular clinic in which it is distributed is not licensed.

We conclude that the Act is content-based, but does not discriminate based on viewpoint.

> i.  Even Though the Act Engages in Content-Based Discrimination, Strict Scrutiny is Inappropriate.

In arguing that content-based regulations are always subject to strict scrutiny, Appellants cite the Supreme Court's recent decision in *Reed*. In *Reed*, the Supreme Court held that a town's regulation of the manner in which outdoor signs were displayed was content-based and unable to satisfy strict scrutiny. 135 S. Ct. at 2227, 2231. In reaching this conclusion, the Court expressly stated that "[c]ontent-based laws . . . are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Id.* at 2226.

*Reed*, however, does not require us to apply strict scrutiny in this case. Since *Reed*, we have recognized that not all content-based regulations merit strict scrutiny. *See United States v. Swisher*, 811 F.3d 299, 311–13 (9th Cir. 2016) (en banc) (discussing *Reed* and noting examples that illustrate that "[e]ven if a challenged restriction is content-based, it is not necessarily subject to strict scrutiny").

Further, the Supreme Court has recognized a state's right to regulate physicians' speech concerning abortion. In *Casey*,

the Supreme Court considered Pennsyvania's requirement that a physician provide abortion-related information to his or her patient, writing:

> All that is left of petitioners' argument is an asserted First Amendment right of a physician not to provide information about the risks of abortion, and childbirth, in a manner mandated by the State. To be sure, the physician's First Amendment rights not to speak are implicated . . . but only as part of the practice of medicine, *subject to reasonable licensing and regulation by the State* . . . We see no constitutional infirmity in the requirement that the physician provide the information mandated by the State here.

505 U.S. at 884 (citations omitted) (emphasis added). Over a decade later, in *Gonzales v. Carhart*, the Court wrote that "the State has a significant role to play in regulating the medical profession." 550 U.S. 124, 157 (2007).

In interpreting these cases, courts have not applied strict scrutiny in abortion-related disclosure cases, even when the regulation is content-based. *See Stuart*, 774 F.3d at 248–49 (applying intermediate scrutiny); *Tex. Med. Providers Performing Abortion Servs. v. Lakey*, 667 F.3d 570, 576 (5th Cir. 2012) (applying a reasonableness test); *Planned Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d 724, 734–35 (8th Cir. 2008) (applying a reasonableness test).

Thus, Appellants' argument that the Act, a content-based regulation, must be subject to strict scrutiny is unpersuasive. We have recognized that not all content-based regulations are

subject to strict scrutiny, and courts have routinely applied a lower level of scrutiny when states have compelled speech concerning abortion-related disclosures.

      ii.  *Casey* Did Not Announce a Rule Regarding the Level of Scrutiny to Apply to Abortion-related Disclosure Cases.

Although courts are in agreement that strict scrutiny is inappropriate in abortion-related disclosure cases, there is currently a circuit split regarding the appropriate level of scrutiny to apply. In interpreting *Casey* and *Gonzales*, and in particular the above quoted excerpt from *Casey*, the Fifth and Eighth Circuits have applied a "reasonableness" test when determining whether an abortion-related disclosure law violated physicians' First Amendment rights. In *Lakey*, the Fifth Circuit held that the appropriate level of scrutiny for abortion-related disclosures was "the antithesis of strict scrutiny," upholding a law requiring doctors to show pregnant women sonograms of their fetuses and make audible the fetuses' heartbeats. 667 F.3d at 575. The *Lakey* court interpreted *Casey* and *Gonzales* to mean that such laws were permissible as they "are part of the state's reasonable regulation of medical practice." *Id.* at 576. Similarly, in construing *Casey* and *Gonzales*, the Eighth Circuit upheld a law regulating informed consent to abortion, concluding that a state "can use its regulatory authority to require a physician to provide truthful, non-misleading information" to patients in the context of abortion-related disclosures. *Rounds*, 530 F.3d at 734–35.

The Fourth Circuit, however, disagreed that *Casey* created an entirely new standard to apply in abortion-related disclosure cases. In *Stuart*, the Fourth Circuit concluded that

"[t]he single paragraph in *Casey* does not assert that physicians forfeit their First Amendment rights in the procedures surrounding abortions, nor does it announce the proper level of scrutiny to be applied to abortion regulations that compel speech[.]" 774 F.3d at 249. The court also noted that *Gonzales* did not shed light on the First Amendment standard post-*Casey*, since *Gonzales* was not a First Amendment case. *Id.* Thus, the court assessed a law requiring doctors to perform an ultrasound, sonogram, and describe the fetus to pregnant patients under a professional speech framework. *Id.* at 247–48, 252, 256. The court concluded that intermediate scrutiny was the appropriate standard and that the law failed this level of scrutiny. *Id.* Applying intermediate scrutiny, the court explained, was "consistent with Supreme Court precedent and appropriately recognizes the intersection . . . of regulation of speech and regulation of the medical profession in the context of an abortion procedure." *Id.* at 249.

We agree with the Fourth Circuit that *Casey* did not establish a level of scrutiny to apply in abortion-related disclosure cases. *Casey*'s short discussion of a physician's First Amendment rights in the context of abortion means only what it says—that there was no violation of the physicians' First Amendment rights given the particular facts of *Casey*. *See* 505 U.S. at 884 ("We see no constitutional infirmity in the requirement that the physician provide the information mandated by the State *here*." (emphasis added)). We need not "read too much," *Stuart*, 774 F.3d at 249, into *Casey*'s statement that physicians are "subject to reasonable licensing and regulation by the State." 505 U.S. at 884. *Casey* did not announce an entirely new rule with this limited statement. *See Stuart*, 774 F.3d at 249 ("That particularized finding [in *Casey*] hardly announces a guiding standard of scrutiny for

use in every subsequent compelled speech case involving abortion."). Nor did it render inapplicable other frameworks for assessing free speech claims when the speech at issue concerns abortion. Instead, what *Casey* did was merely confirm what we have always known, which is that professionals are subject to reasonable licensing by the state. *See, e.g.*, *Dent v. West Virginia*, 129 U.S. 114, 122 (1889) (examining a law regulating the medical profession and writing that "[t]he power of the state to provide for the general welfare of its people authorizes it to prescribe all such regulations as in its judgment will secure or tend to secure them against the consequences of ignorance and incapacity, as well as of deception and fraud").

We also agree with the Fourth Circuit that *Gonzales* did not clearly speak to the level of scrutiny to apply to physician's First Amendment rights. *See Stuart*, 774 F.3d at 249 ("The fact that a regulation does not impose an undue burden on a woman under the due process clause does not answer the question of whether it imposes an impermissible burden on the physician under the First Amendment.").

We rule that strict scrutiny is inappropriate, and that *Casey* did not announce a level of scrutiny to apply in abortion-related disclosure cases.

> 2. The Licensed Notice Is Professional Speech Subject to Intermediate Scrutiny.

In *Pickup*, we assessed the level of scrutiny to apply to Senate Bill 1172, a California law that banned mental health therapists from conducting on minor patients any practice that purported to change a patient's sexual orientation. 740 F.3d at 1221. We explained that the level of protection to apply to

specific instances of professional speech or conduct is best understood as along a continuum. At one end is a professional's right to engage in a "public dialogue, [where] First Amendment protection is at its greatest." *Id.* at 1227. There, "[professionals] are constitutionally equivalent to soapbox orators and pamphleteers, and their speech receives robust protection[.]" *Id.* at 1227–28. On the other end lies professional conduct, where the speech at issue is, for example, a form of treatment. *Id.* at 1229. When regulating conduct, "the state's power is great, even though such regulation may have an incidental effect on speech." *Id.* Because the law in *Pickup* involved the regulation of a specific type of therapy, we held that it regulated professional conduct subject to rational basis review. *Id.* at 1231.

*Pickup* also delineated professional speech that falls in the middle of the continuum. At the midpoint, "the First Amendment tolerates a substantial amount of speech regulation within the professional-client relationship that it would not tolerate outside of it" because "[w]hen professionals, by means of their state-issued licenses, form relationships with clients, the purpose of those relationships is to advance the welfare of the clients, rather than to contribute to public debate." *Id.* at 1228. *Pickup*, however, never discussed the level of scrutiny appropriate for speech that fell at the midpoint.

We conclude that the Licensed Notice regulates speech that falls at the midpoint of the *Pickup* continuum, and that intermediate scrutiny should apply.

To begin, the Licensed Notice regulates professional speech. Underlying the *Pickup* opinion is the principle that professional speech is speech that occurs between

professionals and their clients in the context of their professional relationship. In other words, speech can be appropriately characterized as professional when it occurs within the confines of a professional's practice. *See King v. Governor of N.J.*, 767 F.3d 216, 232 (3d Cir. 2014) ("[W]e conclude that a licensed professional does not enjoy the full protection of the First Amendment when speaking as *part of the practice of her profession*." (emphasis added)). The idea that the speech that occurs between a professional and a client is distinct from other types of speech stems from the belief that professionals, "through their education and training, have access to a corpus of specialized knowledge that their clients usually do not" and that clients put "their health or their livelihood in the hands of those who utilize knowledge and methods with which [they] ordinarily have little or no familiarity." *Id.*; *see also Lowe v. SEC*, 472 U.S. 181, 232 (1985) (White, J., concurring) ("One who takes the affairs of a client personally in hand and purports to exercise judgment on behalf of the client in the light of the client's individual needs and circumstances is properly viewed as engaging in the practice of a profession."). This is why states have the power to regulate professions, *see, e.g.*, *Barsky v. Bd. of Regents of Univ. of N.Y.*, 347 U.S. 442, 449 (1954) ("The state's discretion . . . extends naturally to the regulation of all professions concerned with health."), as well as the power to regulate the speech that occurs within the practice of the profession.

Licensed clinics engage in speech that occurs squarely within the confines of their professional practice. For example, Pregnancy Care Clinic provides medical services such as ultrasounds, clinical services such as medical referrals, and non-medical services such as peer counseling and education. Thus, a regular client of Pregnancy Care

could easily use many of their services throughout the stages of her pregnancy, such as receiving educational information about best health practices when pregnant, relying upon Pregnancy Care for regular check-ups, or using Pregnancy Care as a resource for counseling.  In all these instances, the client and Pregnancy Care engage in speech that is part of Pregnancy Care's professional practice of offering family-planning services.  There is no question that Pregnancy Care's clients go to the clinic precisely because of the professional services it offers, and that they reasonably rely upon the clinic for its knowledge and skill.  Because licensed clinics offer medical and clinical services in a professional context, the speech within their walls related to their professional services is professional speech.

The professional nature of their speech does not change even if Appellants decide to have staff members disseminate the Licensed Notice in the clinics' waiting rooms, instead of by doctors or nurses in the examining room.  Here, the professional nature of the licensed clinics' relationship with their clients extends beyond the examining room.  All the speech related to the clinics' professional services that occurs within the clinics' walls, including within in the waiting room, is part of the clinics' professional practice.  Furthermore, the Licensed Notice contains information regarding the professional services offered by the clinics, and thus would constitute professional speech regardless of where within the clinic it was disseminated.

We now turn to the correct level of scrutiny to apply to the Licensed Notice and conclude that under our precedent in *Pickup*, intermediate scrutiny applies.  Licensed Clinics are not engaging in a public dialogue when treating their clients, and they are not "constitutionally equivalent to soapbox

orators and pamphleteers." *Pickup*, 740 F.3d at 1227. Thus, it would be inappropriate to apply strict scrutiny. And, unlike in *Pickup*, the Licensed Notice does not regulate therapy, treatment, medication, or any other type of conduct. Instead, the Licensed Notice regulates the clinics' speech in the context of medical treatment, counseling, or advertising.[7]

Because the speech here falls at the midpoint of the *Pickup* continuum, it is not afforded the "greatest" First Amendment protection, nor the least. *Id.* It follows, therefore, that speech in the middle of the *Pickup* continuum should be subject to intermediate scrutiny. *See Stuart*, 774 F.3d at 249 (applying intermediate scrutiny when physicians challenged an abortion-related disclosure law they claimed violated their First Amendment rights); *King*, 767 F.3d at 237 (applying intermediate scrutiny when therapists challenged a law prohibiting therapy that purported to change patients' sexual-orientation, which it had determined was professional "speech" rather than "conduct"). Applying intermediate scrutiny is consistent with the principle that "within the confines of a professional relationship, First Amendment protection of a professional's speech is somewhat diminished," *Pickup*, 740 F.3d at 1228, but that professionals also do not "simply abandon their First Amendment rights when they commence practicing a profession." *Stuart*, 774 F.3d at 247.

Appellants cite *In Re Primus*, 436 U.S. 412 (1978), to argue that strict scrutiny should apply to professional speech when the professional services at issue are offered free of

---

[7] We disagree with the district court's conclusion that the Act regulates conduct. The district court's error, however, was harmless as it appropriately denied the motion for a preliminary injunction.

charge.[8]   In *In re Primus*, the Supreme Court addressed whether a lawyer's First Amendment rights were violated when a state bar punished her for writing a letter to a possible client about free legal services available at the American Civil Liberties Union, an organization with which she was affiliated, but offered her no compensation. 436 U.S. at 414–15.  The Supreme Court held that the lawyer's constitutional rights were violated, writing that "[i]n the context of political expression and association . . . a State must regulate with significantly greater precision." *Id.* at 437–38.   Here, however, Appellants have positioned themselves in the marketplace as pregnancy clinics.  Their non-profit status does not change the fact that they offer medical services in a professional context.  Nor does their non-profit status transform them into, for example, an organization that engages in "political expression and association."  *Id.*

> 3.   The Licensed Notice Survives Intermediate Scrutiny.

In order to survive intermediate scrutiny, "the State must show . . . that the statute directly advances a substantial governmental interest and that the measure is drawn to achieve that interest." *Sorrell*, 564 U.S. at 572.  Intermediate scrutiny is "demanding" but requires less than strict scrutiny.

---

[8] We do not think a necessary element of professional speech is for the client to be a paying client. A lawyer who offers her services to a client pro bono, for example, nonetheless engages in professional speech. *But see Moore-King v. Cty. of Chesterfield*, 708 F.3d 560, 569 (4th Cir. 2013) ("[T]he relevant inquiry to determine whether to apply the professional speech doctrine is whether the speaker is providing personalized advice in a private setting to a *paying* client or instead engages in public discussion and commentary." (emphasis added)).

*Retail Digital Network, LLC v. Appelsmith*, 810 F.3d 638, 648 (9th Cir. 2016).   "What is required is 'a fit that is not necessarily perfect, but reasonable; that represents not necessarily the single best disposition but one whose scope is in proportion to the interest served; that employs not necessarily the least restrictive means but . . . a means narrowly tailored to achieve the desired objective.'"   *Id.* at 649 (quoting *Bd. of Trustees of the State Univ. of N.Y. v. Fox*, 492 U.S. 469, 480 (1989)).

We conclude that the Licensed Notice satisfies intermediate scrutiny.  California has a substantial interest in the health of its citizens, including ensuring that its citizens have access to and adequate information about constitutionally-protected medical services like abortion.  The California Legislature determined that a substantial number of California citizens may not be aware of, or have access to, medical services relevant to pregnancy.  *See* Assem. Bill No. 775 § 1(b).  This includes findings that in 2012, 2.6 million California women were in need of publicly-funded family-planning services, and that thousands of pregnant California women remain unaware of the state-funded programs that offer an array of services, such as health education and planning, prenatal care, and abortion.  *Id.*  As we have long recognized, "[s]tates have a compelling interest in the practice of professions within their boundaries, and . . . as part of their power to protect the public health, safety, and other valid interests they have broad power to establish standards for . . . regulating the practice of professions."  *Am. Acad. of Pain Mgmt. v. Joseph*, 353 F.3d 1099, 1109 (9th Cir. 2004) (quoting *Fla. Bar v. Went For It, Inc.*, 515 U.S. 618, 625 (1994)).

We conclude that the Licensed Notice is narrowly drawn to achieve California's substantial interests. The Notice informs the reader only of the existence of publicly-funded family-planning services. It does not contain any more speech than necessary, nor does it encourage, suggest, or imply that women should use those state-funded services. The Licensed Notice is closely drawn to achieve California's interests in safeguarding public health and fully informing Californians of the existence of publicly-funded medical services. And given that many of the choices facing pregnant women are time-sensitive, such as a woman's right to have an abortion before viability, *Casey*, 505 U.S. at 846, we find convincing the AG's argument that because the Licensed Notice is disseminated directly to patients whenever they enter a clinic, it is an effective means of informing women about publicly-funded pregnancy services.

Appellants argue that because California could find other ways to disseminate the information in the Licensed Notice to the public, such as in an advertising campaign, the Act cannot survive heightened scrutiny. The Second and Fourth Circuits used similar reasoning to strike down provisions of abortion-related regulations. *See Evergreen Ass'n, Inc. v. City of N.Y.*, 740 F.3d 233, 250 (2d Cir. 2014) (stating that "the City can communicate this message through an advertising campaign"); *Centro Tepeyac v. Montgomery Cty.*, 722 F.3d 184, 191 (4th Cir. 2013) (en banc) (stating that the government had "several options less restrictive than compelled speech" such as "launch[ing] a public awareness campaign" (internal quotation marks and citation omitted)).

But *Evergreen* and *Centro Tepeyac* applied strict scrutiny, which is much more stringent than the intermediate scrutiny we apply today. Unlike when evaluating a law under strict

scrutiny, under intermediate scrutiny, a law need not be the least restrictive means possible. *See Appelsmith*, 810 F.3d at 649. Thus, even if it were true that the state could disseminate this information through other means, it need not prove that the Act is the least restrictive means possible.[9]

Further, unlike the portions of the regulations before the Second and Fourth Circuits, the Licensed Notice does not use the word "encourage," or other language that suggests the California Legislature's preferences regarding prenatal care. *See Evergreen*, 740 F.3d at 250 (striking down the portion of the regulation that required clinics to state that "the New York City Department of Health and Mental Hygiene encourages women who are or who may be pregnant to consult with a licensed provider"); *Centro Tepeyac*, 722 F.3d at 191 (striking the portion of the regulation that mandated clinics to state that "the Montgomery County Health Officer encourages women who are or may be pregnant to consult with a licensed health care provider").

> 4. The Unlicensed Notice Survives Any Level of Review.

We now address the speech regulated by the Unlicensed Notice. While we acknowledge that unlicensed clinics do not offer many of the medical services available at licensed

---

[9] We note that, given the preliminary stage of this case, it is unclear whether California actually could have disseminated this information as effectively in an advertising campaign, as Appellants argue. At oral argument, the AG noted that California has advertised its publicly-funded programs, but many women were still unaware of their existence given the expansion of certain health programs. Oral Argument at 28:44, *A Woman's Friend Pregnancy Resource Clinic v. Harris*, No. 15-17517, http://www.ca9.uscourts.gov/media/view_video.php?pk_vid=0000009827.

clinics, they nonetheless offer some professional services. Fallbrook Pregnancy Center, for example, offers educational programs. They also give medical referrals for ultrasounds and sonographs, which are offered nearby. Indeed, the Act covers unlicensed clinics like Fallbrook precisely because their "primary purpose is [to provide] pregnancy-related services" and those services can include collecting health information, offering prenatal care, or pregnancy tests and diagnosis. Cal. Health & Safety Code § 123471(b).

We need not resolve the question, however, of whether the Unlicensed Notice regulates professional speech because it is clear to us that the Unlicensed Notice will survive even strict scrutiny.

In order to survive strict scrutiny, a regulation must be "narrowly tailored to serve a compelling interest." *Williams-Yulee v. Fla. Bar*, 135 S. Ct. 1656, 1665 (2015).

California has a compelling interest in informing pregnant women when they are using the medical services of a facility that has not satisfied licensing standards set by the state. And given the Legislature's findings regarding the existence of CPCs, which often present misleading information to women about reproductive medical services, California's interest in presenting accurate information about the licensing status of individual clinics is particularly compelling.

We conclude that the Unlicensed Notice is narrowly tailored to this compelling interest. By stating that the clinic in which it is disseminated is not licensed by the State of California, the Unlicensed Notice helps ensure that women, who may be particularly vulnerable when they are searching for and using family-planning clinical services, are fully

informed that the clinic they are trusting with their well-being is not subject to the traditional regulations that oversee those professionals who are licensed by the state. The Unlicensed Notice is also only one sentence long. It merely states that the facility in which it appears is not licensed by California and has no state-licensed medical provider. It says nothing about the quality of service women may receive at these clinics, and in no way implies or suggests California's preferences regarding unlicensed clinics.

The Second and Fourth Circuits held that regulations with provisions similar to the Unlicensed Notice survived strict scrutiny. In *Evergreen*, the Second Circuit concluded that the portion of the regulation that required clinics to state if they "have a licensed medical provider on staff who provides or directly supervises the provision of all of the services" survived strict scrutiny because it was not overly broad, and was "the least restrictive means to ensure that a woman [was] aware of whether or not a *particular* pregnancy services center ha[d] a licensed medical provider." 740 F.3d at 246–47 (emphasis in original). Similarly, in *Centro Tepeyac*, the Fourth Circuit held that the portion of the regulation that stated "the Center does not have a licensed medical professional on staff," survived strict scrutiny because it "merely notifie[d] patients that a licensed medical professional [was] not on staff, d[id] not require any other specific message, and in neutral language state[d] the truth." 722 F.3d at 190 (internal quotation marks and citation omitted). The surviving portions of the regulations in *Evergreen* and *Centro Tepeyac* merely state whether or not the clinics had licensed providers, which is exactly what the Unlicensed Notice does.

We therefore hold that the district court did not abuse its discretion in finding that Appellants cannot demonstrate a likelihood of success on their free speech claim. The Licensed Notice regulates professional speech, subject to intermediate scrutiny, which it survives. The Unlicensed Notice survives any level of review.[10]

B. Appellants Cannot Demonstrate a Likelihood of Success on their First Amendment Free Exercise Claim.

Courts have long recognized that "the right of free exercise does not relieve an individual of the obligation to comply with a 'valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes).'" *Empl't Div., Dep't. of Human Res. of Or. v. Smith*, 494 U.S. 872, 879 (1990) (quoting *United States v. Lee*, 455 U.S. 252, 263 n.3 (1982) (Stevens, J., concurring in judgment)). A neutral and generally applicable law is subject to only rational basis review. *Stormans, Inc. v. Wiesman*, 794 F.3d 1064, 1075–76 (9th Cir. 2015).

The Act is facially neutral. "A law lacks facial neutrality if it refers to a religious practice without a secular meaning discernable from the language or context." *Id.* at 1076 (citation omitted). The Act references no religious practice and is thus facially neutral.

---

[10] To be clear, we do not conclude that strict scrutiny is the correct level of scrutiny to apply to the Unlicensed Notice. We only conclude that it can survive strict scrutiny.

The Act is also operationally neutral.  It "prescribe[s] and proscribe[s] the same conduct for all, regardless of motivation." *Id.* at 1077.  The Act applies to all covered facilities, and is indifferent to the basis for any objection. Thus, contrary to Appellants' assertion, this case is distinguishable from *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*.  There, the Supreme Court found non-neutral a law that banned animal sacrifices for only a particular religion while sacrifices "that [were] no more necessary or humane in almost all other circumstances [went] unpunished."  508 U.S. 520, 536 (1993).  But, unlike in *Lukumi*, the Act applies to all licensed and unlicensed facilities, regardless of any objection, religious or otherwise. The fact that Appellants' objections are grounded in their religious beliefs does not affect the Act's neutrality.  *See Stormans*, 794 F.3d at 1077 ("The Free Exercise Clause is not violated even if a particular group, motivated by religion, may be more likely to engage in the proscribed conduct.").

The Act is generally applicable.  "[I]f a law pursues the government's interest only against conduct motivated by religious belief but fails to include in its prohibitions substantial, comparable secular conduct that would similarly threaten the government's interest, then the law is not generally applicable." *Id.* at 1079 (internal quotation marks and citation omitted).  A law is not generally applicable if it "in a selective manner impose[s] burdens only on conduct motivated by religious belief[.]" *Lukumi*, 508 U.S. at 543.

The Act has two exemptions, and neither renders the Act not generally applicable.  As noted, the Act's first exemption exists to avoid federal preemption, and its second exemption is for clinics that already provide all of the publicly-funded services outlined in the Act.  *See supra* section II.A.1.

Because the Act's exemptions are "tied directly to limited, particularized, business-related, objective criteria," the Act is generally applicable. *Stormans*, 794 F.3d at 1082.

And finally, this action is not a "hybrid-rights" case in which a free exercise plaintiff has made out a "colorable claim that a companion right has been violated." *San Jose Christian Coll. v. City of Morgan Hill*, 360 F.3d 1024, 1032 (9th Cir. 2004). Appellants have not shown a likelihood of success on the merits of their free speech claim. Thus, there is no "colorable claim" for "a companion right." *Id.*

We conclude that the Act is a neutral law of general applicability, subject to only rational basis review. *See Stormans*, 794 F.3d at 1075–76. Because the Licensed Notice survives intermediate scrutiny, and the Unlicensed Notice survives any level of review, the Act necessarily also survives rational basis review.[11]

## CONCLUSION

Appellants have failed to demonstrate that the first, most important, *Winter* factor favors granting their motion for a preliminary injunction. *Garcia*, 786 F.3d at 740. We reject Appellants' arguments that they are entitled to a preliminary

---

[11] We also find that Appellants have not raised "serious questions" going to the merits of their claims; thus, the alternate test set forth in *Alliance for the Wild Rockies* does not apply. The district court's conclusion that there were serious questions going to the merits was harmless error because the district court appropriately denied the motion for a preliminary injunction. Because Appellants cannot show a likelihood of success on the merits or "serious questions" going to the merits of their First Amendment claims, we need not discuss the remaining *Winter* factors.

injunction based on their free speech claims.  The Act is a content-based regulation that does not discriminate based on viewpoint.  And because *Casey* did not announce a new rule regarding the level of scrutiny to apply to abortion-related disclosure cases, we apply this Court's professional speech framework and conclude that the Licensed Notice is subject to intermediate scrutiny, which it survives.  The Unlicensed Notice survives any level of review.

We also reject Appellants' arguments that they are entitled to a preliminary injunction based on their free exercise claims.  The Act is a neutral law of general applicability, which survives rational basis review.

Appellants, therefore, are unable to demonstrate likelihood of success on the merits of their First Amendment claims.

**AFFIRMED.**